655 So.2d 824 (1995)
Anthony CARR
v.
STATE of Mississippi.
No. 90-DP-01106.
Supreme Court of Mississippi.
February 2, 1995.
Rehearing Denied June 22, 1995.
*828 Ronald W. Lewis, Oxford, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
JAMES L. ROBERTS, Jr., Justice, for the Court:
On February 3, 1990, Anthony Carr was arrested and charged with the capital murders of Charlotte, Carl, Gregory and Bobbie Jo Parker in Clarksdale, Mississippi. Carr was indicted by a Quitman County Grand Jury on March 12, 1990.
Following a change of venue, Carr's trial commenced in Alcorn County on September 10, 1990. He was convicted on all four counts of capital murder and sentenced to death by lethal injection for each count. Carr's Motion for a New Trial was denied on October 15, 1990. Aggrieved by the judgment and sentence against him, Carr appealed, assigning as error the following:
I. JURY INSTRUCTION S-5 AT THE GUILT/INNOCENCE PHASE RELIEVED THE STATE OF THE BURDEN OF PROVING INTENT TO COMMIT THE UNDERLYING FELONIES, THEREBY VIOLATING THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
II. THE TRIAL COURT ERRED IN DISALLOWING TESTIMONY THAT CARR'S CODEFENDANT HAD CONFESSED TO KILLING THE PARKERS AND PROVIDING THE WEAPONS USED IN THE CRIME.
III. THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO ELICIT HEARSAY EVIDENCE FROM SHERIFF HARRISON IN VIOLATION OF CARR'S CONFRONTATION RIGHTS AND RIGHT TO A FAIR TRIAL.
IV. THE TRIAL COURT ERRED IN ADMITTING PART OF SIMON'S OUT-OF-COURT *829 STATEMENT BUT EXCLUDING THAT PART IN WHICH SIMON ADMITTED HE PROVIDED THE WEAPON.
V. THE TRIAL COURT ERRED IN EXCLUDING EXPERT TESTIMONY THAT THE DEFENDANT HAD PASSED A LIE DETECTOR TEST.
VI. THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF UNRELIABLE TESTIMONY.
VII. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE VERDICTS.
VIII. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE JURY'S FINDINGS THAT ANTHONY CARR INTENDED TO KILL AND CONTEMPLATED THE USE OF LETHAL FORCE.
IX. THE COURT ERRED IN TRANSFERRING THE CASE TO A COUNTY IN WHICH THE RACIAL MAKE-UP OF THE VOTING AGE POPULATION WAS SIGNIFICANTLY LOWER THAN THAT OF THE ORIGINAL VENUE, RESULTING IN A TRIAL BY AN ALL-WHITE JURY.
X. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO DISMISS THE CHARGES OR THE PROSECUTOR DUE TO PROSECUTORIAL MISCONDUCT AND UNFAIR PREJUDICIAL PUBLICITY.
XI. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S REQUEST FOR INDIVIDUAL SEQUESTERED VOIR DIRE.
XII. THE TRIAL COURT ERRED IN ALLOWING THE STATE TO PEREMPTORILY STRIKE JUROR NUMBER 14 IN VIOLATION OF BATSON v. KENTUCKY.

XIII. THE PROSECUTION VIOLATED DEFENDANT'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS BY COMMENTING ON CARR'S RIGHT TO SILENCE.
XIV. THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF DR. MONA CARLYLE.
XV. THE TRIAL COURT ERRED IN LIMITING CROSS-EXAMINATION OF DR. CARLYLE.
XVI. THE COURT ERRED IN INSTRUCTING THE JURY THAT "DELIBERATE DESIGN" COULD "EXIST IN THE MIND OF THE DEFENDANT BUT FOR AN INSTANT."
XVII. THE TRIAL COURT'S INSTRUCTION TO THE JURY ON THE MANNER OF ITS DELIBERATIONS WAS UNDULY COERCIVE, IN THAT IT FORBADE ANY CONSIDERATION OF THE LESSER INCLUDED OFFENSES UNTIL AND UNLESS THE JURY HAD UNANIMOUSLY AGREED TO ACQUIT THE DEFENDANT OF THE GREATER CHARGE. THIS COERCIVE INSTRUCTION IS NOT REQUIRED BY MISSISSIPPI STATUTORY LAW, AND IN FACT VIOLATES THE DUE PROCESS CLAUSES OF THE STATE AND FEDERAL CONSTITUTIONS.
XVIII. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT THE CRIME OF KIDNAPPING REQUIRES THE ELEMENT OF ASPORTATION.
XIX. THE TRIAL COURT ERRED IN REFUSING DEFENDANT'S INSTRUCTION D-8.
XX. THE TRIAL COURT ERRED IN PERMITTING PORTIONS OF THE TRIAL TO TAKE PLACE WITHOUT THE PRESENCE OF THE DEFENDANT.
XXI. THE COURT ERRED IN ITS LIMITING INSTRUCTION OF THE AGGRAVATING CIRCUMSTANCE "THE CAPITAL OFFENSE WAS ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL."
XXII. THE TRIAL COURT ERRED IN ALLOWING THE JURY TO CONSIDER THE AGGRAVATING CIRCUMSTANCE PECUNIARY GAIN IN EACH OF THE FOUR CASES.
XXII. THE PROSECUTION'S CLOSING ARGUMENTS CONCERNING BIBLICAL LAW VIOLATED ANTHONY CARR'S RIGHT TO A FAIR TRIAL.

*830 XXIV. THE TRIAL COURT ERRED IN ALLOWING THE JURY TO CONSIDER THE AGGRAVATING CIRCUMSTANCE OF "AVOIDING LAWFUL ARREST" IN EACH OF THE FOUR CASES.
XXV. THE TRIAL COURT ERRED IN LIMITING CONSIDERATION OF EMOTIONAL DISTURBANCE MITIGATION TO "EXTREME EMOTIONAL DISTURBANCE."
XXVI. THE TRIAL COURT ERRED IN REFUSING TO GIVE PEREMPTORY INSTRUCTIONS ON THE UNDISPUTED MITIGATING CIRCUMSTANCES.
XXVII. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY IT MUST MAKE FINDINGS OF THE AGGRAVATING CIRCUMSTANCES.
XXVIII. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY AT SENTENCING IT COULD CONSIDER "THE DETAILED CIRCUMSTANCES OF THE OFFENSE."
XXIX. THE DEATH PENALTY IS DISPROPORTIONATE IN THIS CASE WHERE THE DEFENDANT HAS A LONG HISTORY OF MENTAL PROBLEMS AND RETARDATION, THE JURY DID NOT FIND THAT HE KILLED OR ATTEMPTED TO KILL, AND HIS INVOLVEMENT WAS MINOR COMPARED TO THE CODEFENDANT.
XXX. THE CUMULATIVE ERROR IN THIS RECORD REQUIRES THAT THE CONVICTION AND SENTENCE BE REVERSED.

STATEMENT OF FACTS
On Friday, February 2, 1990, Carl Parker, his wife Bobbie Jo, and their children, twelve year old Gregory and nine year old Charlotte, left the Riverside Baptist Church in Clarksdale to return to their home on Highway 322 in rural Quitman County, some fifteen miles from Clarksdale. The Parkers were last seen leaving the church between 8:45 and 9:15 p.m. that evening.
Around 11:00 p.m., Billy King was driving east on Highway 322 when he spotted a fire at the Parker home. Mr. King went to the house, tried to open the unlocked carport door, but was driven back by the fire. Mr. King left the Parkers' house and drove to the house of the nearest neighbor to call for help. Mr. King did not pass any vehicles on his way to the neighbor's house, but as he looked back towards the Parkers' house from the neighbors' front door, he saw two vehicles leave the Parker house, driving west on Highway 322.
At approximately the same time that King was at the neighbor's house trying to get help, Joe McCullough was driving east on Highway 322. McCullough testified that he remembered meeting two vehicles that were tailgating closely and traveling very fast towards Clarksdale. He identified the lead vehicle as a Silverado pick-up truck.
Fireman Jerry Wages with the Lambert Volunteer Fire Department received the call reporting the Parkers' fire between 11:00 and 11:20 p.m. It was raining heavily that evening. Wages was the first to arrive at the scene of the fire, and he found the southwest corner of the house on fire. The back door was unlocked, and he crawled into the house. He recovered the body of Carl Parker. Wages went back into the house and recovered the bodies of Charlotte and Gregory. Wages recalled that Carl and Gregory were bound at their feet and ankles and their wrists were tied behind their backs. There was also a remnant of a binding on Charlotte's wrist. Charlotte was undressed from the waist down beneath the dress she was wearing. Wages said she had a wound on her hip as well. The body of Bobbie Jo Parker was not discovered until the early morning hours after the fire was finally extinguished. Her body was found in the southwest corner of the house and was burned beyond recognition.
Quitman County Sheriff Jack Harrison arrived at the scene and notified authorities that Carl Parker's red Silverado pick-up truck was missing. He saw the bodies and noticed the hands and feet of Carl and Gregory were bound. Charlotte had a red ribbon tied around her arm. Her knee high stockings *831 were partially burned off, and she did not have on underclothes. Bobbie Jo Parker's body was found lying on some springs around 2:00 or 2:30 a.m.
Around midnight that same night, Eddie Lee Spralls, a Clarksdale resident, looked out his back window after hearing a door slam and observed a red truck backing up between two abandoned houses. Spralls called the police. Upon arrival, the Clarksdale police put a spotlight on the truck. Two black males jumped out of the truck and ran toward Highway 61.
The truck, identified by the police as Carl Parker's, was parked close to the home of Robert Simon's mother-in-law. It was filled with household items, furniture, appliances, and other valuables, all belonging to the Parkers. A shotgun was found in the back of the truck, and a pillow case containing two revolvers and other items belonging to the Parkers was found near the truck.
Martha Simon, Robert Simon's wife, had left Memphis and had driven to Clarksdale to see her mother on February 2, 1990. She said that Carr had been living with her and Robert in their Memphis apartment for the previous three weeks. Around 12:30 a.m. on February 3, 1990, Martha was in her car when she saw Carr walking down the street. Carr asked Martha if she had seen Robert. Martha replied that she thought Carr and Robert had been together, but Carr told her that he had come on ahead and Robert was behind him. She asked Carr how he got to town. Carr responded that he was driving a truck and pointed in the direction where the Parker truck was later found. Carr told her that he had parked the truck on 9th Street and that the truck had "stuff" in it. He also told Martha that he had some money. Carr said that he had put the keys to the truck along the railroad tracks and some coveralls in a dumpster, the location of which Carr told her.
Martha again saw Carr looking for Robert around 8:00 a.m. at her mother's house. The next time she saw Carr, Robert was with him. They came to Martha's mother's house and told her they were going to Memphis. Carr was wearing a black jogging suit each of the three times Martha saw him.
Coahoma County Sheriff Andrew Thompson, Jr., received information from Martha Simon that led to the recovery of a pair of coveralls and a pair of work gloves from a locked dumpster near Simon's mother-in-law's house in Clarksdale. The coveralls were wet and smelled of smoke. The gloves were identified by Dean Parker, Carl Parker's son, as the same type gloves he had given his father.
Ken Dickerson, an investigator with the Highway Patrol, and Sheriff Thompson, with Martha Simon's permission and in her company, went to Memphis to search the apartment she shared with her husband, Robert Simon. They found the wet, black jogging suit Carr was wearing earlier that day. Other items including a man's and a woman's wedding rings, a money clip, and ammunition were also found in the apartment. Martha identified items in the apartment that had not been there earlier.
Scott Parker and Dean Parker, Carl's sons from a previous marriage, identified many of the items found in the truck, the pillow case, and the apartment in Memphis. Carr's fingerprint was found on the shotgun found in the truck.
On February 3, 1990, two arrest warrants were issued in Marks, Mississippi. Anthony Carr and Robert Simon, Jr., were arrested around 3:30 p.m. that day in Clarksdale.
According to Anthony Washington, an inmate at the Tate County jail in the early part of February, 1990, Carr came in around midnight and was put into the cell next to his. Washington asked who he was and what he was in for, and Carr told him. Washington had been reading about the crime in the newspaper and offered to read the story to Carr. Washington said that he and Carr were playing cards when Carr stopped and said "we had a ball," as he held his hand to his head like a gun.
Carr was later taken for a blood test. Upon his return, Carr asked Washington "are you straight?" and whether he could tell Washington something "brother to brother." Carr asked Washington if they could tell if he raped that little girl, and Washington *832 asked him what happened. Carr told Washington that he and his partner had raped the little girl and that one of them had to burn the house down to destroy the evidence.
Dr. Steven Hayne, a pathologist, testified to the cause of deaths of each of the Parkers. Carl and Gregory, both shot twice, died of gunshot wounds. Bobbie Jo, burned beyond recognition and with one bullet retrieved, died of a gunshot wound. Charlotte, shot three times, died of smoke inhalation. Dr. Hayne testified that there was evidence of sexual battery, both vaginally and anally, to Charlotte. Also, the fourth digit of Carl Parker's left hand was missing.
After many pretrial motions, a change of venue motion was granted. The trial was held in Alcorn County on September 10-19, 1990. Carr was convicted on all four counts of capital murder and sentenced to death by lethal injection for each count. Carr raises thirty issues in which he claims error was committed by the trial court. After full consideration of each assignment of error, we affirm both Carr's conviction and sentence to death by lethal injection on each of the four counts.

DISCUSSION OF THE ISSUES
Many of the issues raised by Carr were not brought to the attention of the lower Court by appropriate timely objection. We have repeatedly held that "if no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." Cole v. State, 525 So.2d 365, 369 (Miss. 1987), cert. denied, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988).
Although the procedural bar alone is sufficient to withstand any subsequent review, this Court may review the merits of the underlying claim. This issue was addressed in Sawyers v. Collins, 986 F.2d 1493 (5th Cir.1993), cert. denied, ___ U.S. ___, 113 S.Ct. 2405, 124 L.Ed.2d 300 (1993), where the Fifth Circuit Court of Appeals stated:
On application for the writ of habeas corpus, federal courts will not review a state court's holding on a federal law claim ... if that holding rests upon a state law ground which is both independent of the merits of the federal claim and adequate to support the state court's judgment. Harris v. Reed, 489 U.S. 255, 260-63, 109 S.Ct. 1038, 1042-43, 103 L.Ed.2d 308 (1989). Consequently, "when a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." Ylst v. Nunnemaker, 501 U.S. 797, [801] 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991) (citing Wainwright v. Sykes, 433 U.S. 72, 87-88, 97 S.Ct. 2497, 2506-07, 53 L.Ed.2d 594 (1977)); Murray v. Carrier, 477 U.S. 478, 485-92, 106 S.Ct. 2639, 2643-48, 91 L.Ed.2d 397 (1986). Furthermore, where a state court finds that a federal claim is procedurally barred, but goes on to reach the merits of that claim in the alternative, the state court's reliance on the procedural default still constitutes an independent and adequate state ground which bars federal habeas review.
Sawyers, 986 F.2d at 1499.
In Harris v. Reed, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), the United States Supreme Court noted:
A state court remains free ... to rely on a state procedural bar and thereby to foreclose federal habeas review... . Moreover, a state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.
Harris, 489 U.S. at 264 and n. 10, 109 S.Ct. at 1044 and n. 10.
We hold that the assignments of error raised by Carr which were not properly presented to the trial court by contemporaneous objection are procedurally barred from consideration. After careful consideration of the remaining issues, we find them to be without merit.

GUILT PHASE

I.

JURY INSTRUCTION S-5 AT THE GUILT/INNOCENCE PHASE RELIEVED *833 THE STATE OF THE BURDEN OF PROVING INTENT TO COMMIT THE UNDERLYING FELONIES, THEREBY VIOLATING THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
Carr argues that jury instruction S-5 violated the due process clause of the Fourteenth Amendment because it relieved the State of the burden of proving that Carr had the intent to commit the underlying felonies. The challenged instruction reads as follows:
The court instructs the jury that each person present at the time, and consenting to and encouraging the commission of a crime, and knowingly, wilfully, and feloniously doing any act which is an element of the crime or immediately connected with it, or leading to it's [sic] commission, is as much a principal as if he had with his own hand committed the whole offense; and if you believe from the evidence beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the defendant, ANTHONY CARR, did wilfully, unlawfully and feloniously do any act which is an element of the crimes with which he is charged or immediately connected with them or leading to their commission, then and in that event, you should find the defendant guilty of that crime as the case may be.
Since Carr failed to object at trial to instruction S-5, the objection has not been properly preserved for review by this Court. Willie v. State, 585 So.2d 660, 680 (Miss. 1991) (citing Moawad v. State, 531 So.2d 632, 635 (Miss. 1988)). Therefore, this assignment of error is procedurally barred.
Even without the procedural bar, this Court would find Carr's contention meritless. He argues that the language of S-5 creates a conclusive presumption that the jury only had to find that Carr performed an act connected with the crime, and not that he intended to commit the crime, to find him guilty of the underlying felony.
In Simmons v. State, 568 So.2d 1192 (Miss. 1990), this Court upheld a similar jury instruction, which was challenged because it did not require that the jury find beyond a reasonable doubt that the defendant had committed every element of the crime.
We find that jury instruction S-5 sufficiently instructed the jurors on the element of intent. Furthermore, when read in the context of the jury charge as a whole, S-5 correctly placed the burden on the State to prove beyond a reasonable doubt every element of the underlying felonies with which Carr was charged.
This assignment of error is procedurally barred and, alternatively, without merit.

II.

THE TRIAL COURT ERRED IN DISALLOWING TESTIMONY THAT CARR'S CODEFENDANT HAD CONFESSED TO KILLING THE PARKERS AND PROVIDING THE WEAPONS USED IN THE CRIME.

III.

THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO ELICIT HEARSAY EVIDENCE FROM SHERIFF HARRISON IN VIOLATION OF CARR'S CONFRONTATION RIGHTS AND RIGHT TO A FAIR TRIAL.

IV.

THE TRIAL COURT ERRED IN ADMITTING PART OF SIMON'S OUT-OF-COURT STATEMENT BUT EXCLUDING THAT PART IN WHICH SIMON ADMITTED HE PROVIDED THE WEAPON.
All three of these issues involve oral statements made by Robert Simon, Jr. to law enforcement officers during his interrogation after being properly Mirandized. Simon made one statement to law enforcement officers that he saw Carr around 11:00 p.m. on February 2, when Carr gave him a man's and a lady's wedding rings. Simon told law enforcement officers that if he had to guess who committed the crime with Carr, it might be Henderson. This statement indicated that Carr and Henderson committed the *834 murders. Following a break in the interrogation, Simon made another statement that he did not want to say who was with him when "we" committed the murders. Simon also told law enforcement officers that he killed "the Parkers." Simon said that the weapon used to kill the Parkers was "taken from a little old lady in Winona."
Carr asked the trial court to admit the portion of Simon's statements indicating that Simon killed the Parkers and keep out portions of the same statements that indicated Carr killed the Parkers. This request was refused.
Prior to trial, Carr filed a motion in limine to exclude all statements made by Simon. Carr argued that admission of any of the Simon statements would violate Carr's right to confront witnesses. The State announced its intention not to introduce any of Simon's statements, and the trial court ruled Simon's statements would not be admissible against Carr.

A.

GUILT PHASE
During the cross-examination of Bill Ellis, a criminal investigator, Carr moved to introduce the portion of Simon's statement in which Simon alleged that he had killed "the Parkers." The trial court found that the statement was inadmissible "at this time." After the State rested, Carr made an offer of proof that Bill Ellis would testify that Simon said he killed the Parkers with his weapons. The trial court found this statement inadmissible because it lacked corroboration and trustworthiness and because it was not offered to exculpate Carr.[1]
Carr relies on Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), for the proposition that the due process clause supersedes a state hearsay rule when the offered statement is relevant to a critical issue at trial and substantial reasons exist to insure its reliability. In Green, the trial court refused to allow a jail house snitch to testify at the penalty phase that the defendant's co-defendant had confessed to the murders. The Court found the evidence was highly relevant to a critical issue in the penalty phase, substantial reasons existed to assume its reliability, and that the evidence corroborating the confession was ample.
The case sub judice is distinguishable from Green which is applicable to the sentencing phase, not the guilt phase. As the trial judge found, Simon's statement lacked substantial guarantees of reliability and trustworthiness. Inconsistencies in Simon's statement and the conflicting statements he gave concerning his and Carr's involvement in the crime raised doubt as to the truthfulness of Simon's statement.
In the case sub judice, the portion of Simon's statement which alleged that Carr had killed the Parker's was not offered at the guilt phase. Carr offered only the exculpatory portion of the statement in which Simon claimed to have killed the Parker's pursuant to Mississippi Rule of Evidence 804(b)(3), which provides:
(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(3) A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The concern here is corroborating evidence and trustworthiness of the statement. The Rule also looks to whether the statement is offered to exculpate the accused. The trial court specifically found that Simon's motivation in claiming to have killed the Parker's did not appear to be to get Carr off the hook; Simon placed the blame for the murders on Carr within the framework of the same statement *835 Additionally, the inconsistencies in Simon's statement justified the trial judge's finding the statement untrustworthy. We find Simon's statement was properly excluded in the guilt phase under Rule 804(b)(3).
Carr also maintains that the statement was admissible because it was admitted as a confession in the Simon trial. To exclude it now would allow the State to pursue inconsistent theories in their separate prosecutions of Carr and Simon. The answer to that lies in Hoover v. State, 552 So.2d 834, 838 (Miss. 1989), which allows the State to argue alternate theories of the case when prosecuting separate individuals.

B.

SENTENCING PHASE
During the sentencing phase, Carr moved to introduce, through Sheriff Harrison, Simon's statement that he (Simon) killed the Parkers. The trial court first sustained the objection to the admissibility of the statement, but after hearing a proffer of the testimony of Sheriff Harrison in chambers, the trial court decided to allow the statement. However, the trial court also found admissible the further statement made by Simon in which he said that Carr and another person killed the Parkers. Carr objected to the admission of the portion of the statement inculpating Carr as a violation of the Confrontation Clause.
Miss Code Ann.  99-19-101(1) (Supp. 1993) controls what evidence may be presented at the sentencing phase of a capital murder trial and states in part: "evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances." Simon's statement that he killed the Parkers would be relevant to the mitigating factor of whether Carr "was an accomplice in the capital offense committed by another person and his participation was relatively minor." See Miss. Code Ann.  99-19-101(6)(d) (Supp. 1993).
In Davis v. State, 512 So.2d 1291 (Miss. 1987), cert. denied, 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988), this Court addressed the admissibility of mitigating evidence in the sentencing phase. We acknowledged that "[t]he U.S. Constitution requires that defendants be given broad latitude in introducing evidence of mitigating circumstances." Id. at 1292. Furthermore, Mississippi allows admissibility of basically any evidence bearing on mitigation, as long as the evidence is relevant. Id.
Considering the broad latitude given to allow the admissibility of any relevant evidence of mitigating circumstances in the sentencing phase, it was not error for the trial judge to permit Carr to introduce Simon's statement that Simon killed the Parkers. Neither was it error for the trial judge to permit the State to introduce the other statements made by Simon indicating that Carr committed the murders. This Court has addressed the doctrine of completeness and held that the purpose of "[r]ule 106 of the Mississippi Rules of Evidence is to avoid misleading the factfinder by introducing only a fragment of an utterance out of context." Kniep v. State, 525 So.2d 385, 390 (Miss. 1988). Carr wanted to slice out the harmful portions and keep only the portions of the statement which were beneficial to him. See Miss.R.Evid. 106. The jury was entitled to hear the contradictions in Simon's statement.
Moreover, the portion of the statement inculpatory to Carr was admissible to impeach and rebut the mitigating evidence introduced by the defense. See Stringer v. State, 500 So.2d 928, 941 (Miss. 1986).
The trial court properly allowed the introduction of both the inculpatory and exculpatory portions of Simon's statement in the sentencing phase of the trial as they were relevant to mitigating circumstances.

C.

SIMON'S OTHER CRIMES
Carr maintains that it was error for the trial court to exclude the portion of the statement in which Simon discussed other crimes in which he (Simon) had been involved. He specifically refers to Simon's statement that the guns used to kill the Parkers were taken from a little old lady in *836 Winona. Carr contends that portion of the statement should have been admitted because it corroborated Simon's statement that he killed the Parkers.
The trial court properly excluded this statement as it was not relevant to Carr's sentence. The statement referred to other crimes committed by Simon and had no bearing on any aggravating or mitigating circumstances in Carr's case.
There is no merit to Issues II, III or IV.

V.

THE TRIAL COURT ERRED IN EXCLUDING EXPERT TESTIMONY THAT THE DEFENDANT PASSED A LIE DETECTOR TEST.
Carr moved to introduce the testimony of an expert on polygraph testing as a mitigating factor during the sentencing phase. Carr took two different polygraph tests during the course of the investigation of the Parker murders. He passed one test but failed the other. The trial court found both tests were inadmissible.
Mississippi law forbids the admission of the results of a lie detector test. Goodson v. State, 566 So.2d 1142, 1153 (Miss. 1990) (citing Garrett v. State, 549 So.2d 1325, 1330 (Miss. 1989); Miskelley v. State, 480 So.2d 1104, 1108 (Miss. 1985); Pennington v. State, 437 So.2d 37, 40 (Miss. 1983).
In Garrett v. State, 549 So.2d 1325 (Miss. 1989), the rationale behind the rule forbidding the admission of polygraph results was explained.
It is well settled that neither the fact of the taking of a polygraph examination or the results of such an examination are admissible into evidence. The supporting argument for inadmissibility is the idea that it is relevant to establish neither consciousness of guilt, nor an attitude of innocence. If the fact that an accused volunteered to subject himself to polygraph testing is revealed, it may be self serving and destroy any value motivation, particularly if the accused knows that the test results are inadmissible. However, to permit a jury to hear that the accused voluntarily submitted to a polygraph test, without giving the results, may also work a prejudice to the accused. The jury most likely would draw unwarranted inferences as the guilt or innocence of the defendant. Thus, the rule of inadmissibility has valid supporting analysis.
Garrett, 549 So.2d at 1330. (citations omitted)
As Mississippi law clearly states that polygraph tests and their results are inadmissible, the trial court did not err in refusing to admit testimony regarding Carr's polygraph tests.
This assignment of error has no merit.

VI.

THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF UNRELIABLE TESTIMONY OF ANTHONY WASHINGTON.
Carr alleges it was error for the trial court to allow Anthony Washington to testify at trial concerning statements Carr made to Washington while both were incarcerated in the Tate County jail. He maintains such testimony was unreliable. Carr states that the only evidence that Carr was anything but a mere accessory after the fact in this crime was Washington's testimony.
Washington's proposed testimony was a focal point of an extensive pretrial suppression hearing. During the suppression hearing, defense counsel asked Washington on cross-examination if in fact he had come forward with the information regarding Carr because "you saw an opportunity to help yourself." Washington responded that he did not. Defense counsel asked Washington why he did not tell anyone sooner about the information he had regarding Carr and the Parker murders. Washington replied that nobody had asked him.
Following Washington's testimony at the suppression hearing, Carr conceded that there was insufficient proof that Washington had been acting as an agent of the State. At that point the trial court found the statements Carr made to Washington were spontaneous or made as a matter of conversation between two inmates. The court found that *837 Washington "was not acting as an agent for the State or any way subject to the control of the State." It was also noted by the court that Washington did not report the statements until a week after they were made. The trial court denied the defense motion to suppress Carr's statement to Washington.
Carr cites McNeal v. State, 551 So.2d 151 (Miss. 1989), to show this Court's disdain for a prosecutor's reliance on the testimony of a jail house snitch. Id. at 158. Carr cites a string of authority condemning the use of snitches, and pointing up the inherent unreliability in the testimony. However, most of this Court's mistrust in snitch testimony is predicated on the fact that the snitch "gets something" in exchange for his testimony, usually a reduced sentence. See McNeal, 551 So.2d at 158.
In Sudduth v. State, 562 So.2d 67 (Miss. 1990), this Court found that the admission of the testimony of three convicts regarding statements against interest made by the defendant in jail was not error. "The credibility of a witness, even a convict witness, is for the jury." Id. at 70 (citing Bevill v. State, 556 So.2d 699 (Miss. 1990)).
Carr also contends that a cautionary jury instruction should have been given, warning jurors that snitch testimony should be viewed with suspicion. Carr did not request such a cautionary instruction. Failure to request an instruction serves as a bar to raising the point on appeal. Stringer v. State, 500 So.2d 928, 937 (Miss. 1986).
A thorough suppression hearing and extensive cross-examination produced no evidence to indicate that Washington was offered any kind of reduced sentence in exchange for his testimony. In the absence of evidence that he stood to gain anything by his testimony against Carr, Washington's statement was not inherently unreliable. Washington's criminal record, character, motivation, reliability, and the circumstances surrounding his recitation of statements made by Carr were all factors properly left to the jury to weigh. Instruction C-1 properly instructed the jury as to the weight and credibility to be given such testimony. It was not error for the trial court to permit Washington's testimony concerning statements Carr made to him during their incarceration.
There is no merit to this assignment of error.

VII.

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE VERDICTS.
This Court's well-established standard for reviewing the legal sufficiency of the evidence is:
When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all the evidence ÔÇö not just that supporting the case for the prosecution ÔÇö in the light most consistent with the verdict. We give [the] prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge is required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb. [citations omitted].
Roberson v. State, 595 So.2d 1310, 1318 (Miss. 1992) (quoting McFee v. State, 511 So.2d 130, 133-134 (Miss. 1987)). See also Williams v. State, 595 So.2d 1299, 1302 (Miss. 1992); Bush v. State, 585 So.2d 1262, 1263-1264 (Miss. 1991). This same standard is applicable in capital cases. Mackbee v. State, 575 So.2d 16, 36 (Miss. 1990).
When viewed in the light most consistent with the verdict, the evidence in the case sub judice clearly supports the jury's verdict. Moreover, the jury was properly instructed as to the elements of capital murder and the elements of the underlying felonies.
*838 Carr contends that the most the evidence supports is that he was an accessory after the fact. We will consider the evidence indicating that Carr, either on his own or in concert with Simon, was present at the Parker home and the evidence indicating who committed these crimes.
Simon and Carr were seen together earlier on the day the crime was committed. After midnight, when Martha Simon saw Carr, Carr told her that he and Simon had been together but that he had "come on ahead." He also told her he had driven a truck, which turned out to be the stolen Parker truck. Based on information Carr provided Martha, the police recovered from a dumpster coveralls and work gloves that smelled of smoke and were covered with soot.
There was also Billy King's testimony that he saw two vehicles leave the Parker driveway as he waited at the neighbor's house to call for help.
Carl Parker's stolen truck, when recovered, was full of items belonging to the Parkers. Also found in the truck was a .20-gauge shotgun with Carr's fingerprint on it. It was identified as being like one Carl Parker had.
Anthony Washington testified that Carr told him that he and his partner raped the little girl. Carr also stated to Washington that they had a ball, and made a gun with his fingers and held it to his head. The autopsy report showed that nine-year-old Charlotte Parker had tears about the rectum and anus, injuries consistent with sexual battery.
The conflicting evidence involved Carr's movements on the night of February 2, 1990, placing Carr in Clarksdale around the time the coroner said the Parkers died. However, where there is a conflict in the evidence, it is for the jury to resolve the conflict. When judging the credibility of the witnesses, the jury will take into consideration such things as motive and bias. Two of the witnesses who testified on behalf of Carr and to his whereabouts that night were blood kin. See Garrett v. State, 549 So.2d 1325, 1331 (Miss. 1989); Wetz v. State, 503 So.2d 803, 812 (Miss. 1987) (citing VanBuren v. State, 498 So.2d 1224, 1228 (Miss. 1986)).
Considering the evidence in the light most consistent with the verdict, we find the record reflects substantial evidence of such quality to support the verdict reached by reasonable and fair-minded jurors in the exercise of impartial judgment. See McFee v. State, 511 So.2d 130, 133-134 (Miss. 1987).
This assignment of error is without merit.

VIII.

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE JURY'S FINDINGS THAT CARR INTENDED TO KILL AND CONTEMPLATED THE USE OF LETHAL FORCE.
Carr argues that no credible evidence was presented to indicate that he intended a killing should occur or that he contemplated the use of lethal force. The State contends that the evidence was sufficient from which a reasonable jury could conclude that Carr did intend to kill and did contemplate the use of lethal force.
Miss. Code Ann.  99-19-101(7) (Supp. 1992) provides:
In order to return and impose a sentence of death the jury must make a written finding of one or more of the following:
(a) the defendant actually killed;
(b) the defendant attempted to kill;
(c) the defendant intended that a killing take place;
(d) the defendant contemplated that lethal force would be employed.
These findings may only follow from credible evidence. White v. State, 532 So.2d 1207, 1219 (Miss. 1988).
The jury in the case sub judice was instructed on all four of the Enmund factors,[2] pursuant to  99-19-101(7). The jury found that the evidence supported the finding of two of the four factors for each of the four counts of capital murder: that the defendant intended the killing take place; and that the *839 defendant contemplated that lethal force would be employed.
In Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the United States Supreme Court addressed what constituted "intent to kill" and held:
the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.
* * * * * *
We will not attempt to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty here. Rather, we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement.
Id. at 157-158, 107 S.Ct. at 1688, 95 L.Ed.2d at 144-145. Mississippi "requires more in the felony-murder scenario than major participation and reckless indifference to the value of human life." Abram v. State, 606 So.2d 1015, 1042 (Miss. 1992).
Subjectively, we will never know exactly what Carr intended or contemplated; however, the evidence places Carr in the Parker home on the night of their murders. The physical evidence, most specifically the fact that the victims were bound, coupled with all reasonable inferences that can be drawn therefrom, provides sufficient basis from which a jury could reasonably conclude that Carr intended to kill and contemplated that force would be used in these crimes. See Abram, 606 So.2d at 1043.
There is no merit to this assignment of error.

IX.

THE COURT ERRED IN TRANSFERRING THE CASE TO A COUNTY IN WHICH THE RACIAL MAKE-UP OF THE VOTING AGE POPULATION WAS SIGNIFICANTLY LOWER THAN THAT OF THE ORIGINAL VENUE, RESULTING IN A TRIAL BY AN ALL-WHITE JURY.
Carr moved for and was granted a change of venue because of the vast amount of pretrial publicity associated with this case. The original venue was Quitman County, which had a 50% white, 50% non-white voting population. Carr requested that the case be tried in "a demographically similar area with regard to the proportionality of black and white citizens." The case was removed to Alcorn County, which had a majority white population.
During voir dire, Carr moved to quash the jury panel because blacks made up only four per cent (4%) of the panel. In the alternative, Carr moved for a second change of venue. Carr provided the trial court with 1980 census figures for Quitman and Alcorn Counties. In 1980, Quitman County was comprised of 3,949 whites and 3,979 non-whites of voting age (50% white; 50% nonwhite). During the same period of time, Alcorn County consisted of 20,871 whites and 2,234 non-whites (90.3% white; 9.7% nonwhite).
The trial court denied both motions. The court defended its selection of Alcorn County, stating:
[t]he Court being aware of the irresponsible and inaccurate reporting of the Clarion-Ledger throughout the history of this case, it was concerned when it was moved that there would be write-ups, again, about where or the venue to which it was moved and possibly prejudice the defendant in the county to which it was moved, and that was a consideration the Court gave in deciding on Alcorn County. The Court also decided based on where the Court could get the facilities to handle the open space on court dockets and the availability of motels and space for jurors to be sequestered and all of that. Also the Court is of the opinion that or under the impression that the law is that a defendant is not entitled to a jury of any particular race, regardless of what race that defendant might be, but, motion, again to quash the panel and for retransfer will be denied.
*840 "The right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by both the federal and state constitutions." Johnson v. State, 476 So.2d 1195, 1209 (Miss. 1985) (citing Adams v. State, 220 Miss. 812, 72 So.2d 211 (1954)). The issue in this case is not whether a change of venue should have been granted, as it was indeed granted; but whether a second change of venue should have been granted to a county whose racial makeup more closely reflected that of the county where the crime occurred.
It is well-established in Mississippi that [t]he granting of a change of venue is a matter so largely in discretion of the trial court that a judgment of conviction will not be reversed on appeal on the ground that a change of venue was refused, unless it clearly appears that trial court abused its discretion.
Billiot v. State, 454 So.2d 445, 454 (Miss. 1984) (quoting Parks v. State, 267 So.2d 302, 304 (Miss. 1972)). However, Fisher v. State, 481 So.2d 203, 215 (Miss. 1985), admonishes that the decision to change venue, although left to the sound discretion of the trial judge, is not one involving unfettered discretion.
In Britt v. State, 520 So.2d 1377 (Miss. 1988), this Court held that the defendant did have a right to be tried by a jury whose members where selected in a nondiscriminatory manner; however, he was not constitutionally guaranteed that the jury selected had to "mirror the community and reflect the various distinctive groups in the population." Id. at 1379 (citing Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) ("Defendants are not entitled to a jury of any particular composition, ... but the ... venires from which juries are drawn must not systematically exclude distinctive groups in the community....").
In a recent Florida case, the conviction of an Hispanic Miami police officer for the killing of a black male while on duty was reversed on appeal for failure to grant the defendant's change of venue motion. State v. Lozano, 616 So.2d 73, 74 (Fla. Dist. Ct. App. 1993). The case was remanded for a new trial in a another venue. Following a hearing, the trial was moved to Orlando. However, on its own motion, the trial court changed the venue to Tallahassee.
The defendant moved for another change of venue, arguing that the change of venue to Tallahassee violated his rights to equal protection and to a fair trial. Id. Although the State joined the defendant in requesting the trial court to change the venue, the motion was denied.
On a writ of certiorari, the Florida Appeals Court reinstated the order setting the trial in Orlando, finding that the trial court deliberately acted to change venue in an effort to increase the number of black jurors. This violated the rule in Batson v. Kentucky, 476 U.S. 79, 86, 106 S.Ct. 1712, 1717, 90 L.Ed.2d 69 (1986) because "purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." Lozano, 616 So.2d at 75-76.
There is no evidence in the case sub judice, either in the record, or as argued by Carr, that he did not receive a trial by an impartial jury. The trial court gave race neutral reasons for moving the trial to Alcorn County. There was no evidence in the voir dire of the venire that the jurors selected were anything but impartial. There is no constitutional right to have a jury mirror any particular community. See Britt, 520 So.2d at 1379.
Because the Alcorn County jury that tried Carr was selected in a nondiscriminatory manner, this assignment is without merit.

X.

THE TRIAL COURT ERRED IN DENYING CARR'S MOTION TO DISMISS THE CHARGES OR THE PROSECUTOR DUE TO PROSECUTORIAL MISCONDUCT AND UNFAIR PREJUDICIAL PUBLICITY.
As a result of the extensive pretrial publicity this case received, the trial court ordered all attorneys involved to abide by Rule 4.01 of the Uniform Criminal Rules of Circuit Court Practice as well as the Rules of Professional Conduct. The Court also ordered *841 the files pertaining to discovery sealed. As a result of a perceived violation of the court order, Carr filed a Motion to Dismiss Due to Prosecutorial Misconduct and Unfairly Prejudicial Pretrial Publicity, or in the alternative, For Order Requiring District Attorney to Withdraw From the Cases. An amended motion was later filed seeking an order prohibiting the State from seeking the death penalty. A hearing on the matter followed, and the trial court issued an order and opinion denying the Motion.
Carr requested the trial court to certify the order for immediate interlocutory appeal to this Court. The request was denied. Review of the denial was sought by means of a Petition for Leave to Appeal From Interlocutory Appeal Order. This Court denied this request on June 13, 1990.
Carr contends that he was denied a fair trial by the trial court's refusal to dismiss the indictment, or in the alternative, its refusal to remove District Attorney Lawrence Mellen as prosecutor.
One of the allegations Carr makes against the District Attorney is that he placed responses to certain motions, which had been designated closed, in the open file in the Quitman County Circuit Clerk's office. At the hearing on the Motion to Dismiss, Brenda Wiggs, the Circuit Clerk for Quitman County, testified that the prosecution's responses had been filed by one of the assistant district attorneys at 6:55 p.m. on April 27, 1990. The clerk's office was open late that day for voter registration. Ms. Wiggs stated that there was no discussion between the assistant district attorney and herself regarding whether the responses to the motions should go into the closed file. She also admitted that placing the responses in the wrong file was the mistake of the clerk's office; it was the responsibility of the clerk's office to see that the responses were placed in the proper file.
Carr also alleges that District Attorney Mellen made statements that were not based on the "whole story" and statements linking Carr to the crime without mentioning the "presumption of innocence" as required by the Rules of Professional Conduct. Carr maintained that Mellen should have been held responsible for the statements.
Mellen took the stand during the hearing and admitted he did make statements linking Carr to the crime without adding that the defendant was presumed innocent. As to other statements attributed to him, Mellen explained that some of the conversations he had "off the record" ended up in print.
The trial court ruled:
The Court does not find any evidence that the District Attorney intentionally misfiled the two responses that should have been filed in the sealed file. The Court does find, however, he had an affirmative responsibility, after all that had gone on regarding this sealed file, to follow up and see to it that they were properly placed in the closed file. This Court finds that the effort to shift the blame to the Circuit Clerk simply is without merit.
* * * * * *
This error of the prosecutor in failing to file Rule 4.06 information in the closed file as ordered is going to require some remedial measures in this case because of the publicity... . It is going to be a matter that will have to be taken up on a procedure and case by case basis as we move these cases along to and through trials.
This Court recognizes its responsibility to make, or to find some remedies for what has occurred to the extent that it can. However, it is clear ... that the bell has rung, and the Court can't unring the bell... .
The Court is not going to grant the relief asked for the defendant. It is not going to dismiss the indictments; it is not going to dismiss the death penalty; and doubts that the Court has the authority, and would not do it in any event, but certainly doesn't feel it wouldn't even have the authority to remove the District Attorney from the case....
The change of venue motion was later granted, moving the trial to Alcorn County. The State submits that the change of venue afforded Carr relief from any potential prejudicial effects of the pretrial publicity and from any prosecutorial misconduct.
*842 One of the means for vindicating the right of an accused to a fair trial is a change of venue. Fisher v. State, 481 So.2d 203 (Miss. 1985). The danger of the prosecutor's remarks and the misfiling of a sealed document was that the pretrial publicity from such actions would be damaging to Carr's right to a fair trial by an impartial, unbiased jury. Such actions may have prejudiced his rights in Quitman County. However, there is no evidence that Carr received anything but a fair trial in Alcorn County after the motion for a change of venue was granted.
This Court has previously admonished district attorneys for trying cases in the newspapers, rather than in the courtroom. See Foster v. State, 508 So.2d 1111, 1117 (Miss. 1987). District Attorney Mellen's actions in this case involving his remarks to the media and his misfiling of the sealed document in an open file are breaches of his duties as a prosecutor to protect the rights of an accused person to a fair trial, and he is admonished concerning any such future conduct. However, there is no evidence that the change of venue did not cure any damage that may have been done.
We find that Carr was given a fair trial by an unbiased, impartial jury. This assignment of prosecutorial error, although having merit, is found to be harmless.

XI.

THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S REQUEST FOR INDIVIDUAL SEQUESTERED VOIR DIRE.
Carr claims the trial court's refusal to allow individual sequestered voir dire of the entire venire constitutes reversible error. He argues that individualized sequestered voir dire was a necessity due to the amount of pre-trial publicity.
The manner in which voir dire in criminal cases will be conducted is governed by Rule 5.02 of the Mississippi Uniform Criminal Rules of Circuit Court Practice which provides:
In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked.
This Court has held that Rule 5.02 allows a circuit court, in its own discretion, to utilize individualized, sequestered voir dire. Russell v. State, 607 So.2d 1107, 1110 (Miss. 1992); Hansen v. State, 592 So.2d 114, 126 (Miss. 1991). However, this Court has further held that Rule 5.02 does not require more than what it states on its face. Russell, 607 So.2d at 1110; Hansen, 592 So.2d at 126; White v. State, 532 So.2d 1207, 1218 (Miss. 1987); West v. State, 463 So.2d 1048, 1054 (Miss. 1985). The trial court in the case sub judice did not abuse the discretion awarded it by Rule 5.02.
The trial court requested counsel to work together to come up with a jury questionaire. In fact the court expressed the hope that the defense's desire for an individually sequestered voir dire could be met to some extent by the jury questionaire.
When the motion for an individualized, sequestered voir dire was heard, the trial court did not rule against it completely, but rather stated that individualized, sequestered voir dire would only be utilized where necessary, such as with embarrassing matters or those which might tend to prejudice a juror.
The United States Supreme Court rejected a similar argument in Mu'Min v. Virginia, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). In Mu'Min, the petitioner was convicted of murder and sentenced to death. There was substantial publicity regarding the case. Eight of the twelve venire persons sworn as jurors had answered during voir dire that they had read or heard something about the case. None of those eight indicated that they had formed an opinion about the case, or that what they had heard or read would affect their ability to perform their duties based solely on the evidence presented at trial.
The petitioner contended that his Sixth Amendment and Fourteenth Amendment rights had been violated when the trial court *843 refused to question the prospective jurors further about the specific contents of what they had read or heard. The trial court denied petitioner's motion for individual voir dire, but stated that it would begin with collective questioning and would break the venire down into panels of four to deal with the issue of publicity if it became necessary.
The United States Supreme Court held that questions pertaining to the content of pretrial publicity to which a juror had been exposed is not constitutionally required. The Court said that such questions are constitutionally required only if the trial court's failure to ask such questions renders the defendant's trial fundamentally unfair. Mu'Min, 500 U.S. at 425-426, 111 S.Ct. at 1905, 114 L.Ed.2d at 506. The Court went on to stress the wide discretion trial courts enjoy in conducting voir dire with respect to the issue of pretrial publicity. Mu'Min, 500 U.S. at 427, 111 S.Ct. at 1906, 114 L.Ed.2d at 507.
Voir dire in the case sub judice was by no means perfunctory. The trial court asked the collective venire about the effect of pretrial publicity or information received about the case. There was no response from the jurors. The court later asked if there was any reason that a juror felt that he or she could not be a fair and impartial juror. Any venire person who responded affirmatively was questioned individually in chambers, and those who stated that they had already formed an opinion in the case were excused.
We find no abuse of discretion in the trial court's refusal to grant Carr's motion for individual sequestered voir dire. There is no merit to this assignment of error.

XII.

THE TRIAL COURT ERRED IN ALLOWING THE STATE TO PEREMPTORILY STRIKE JUROR NUMBER 14 IN VIOLATION OF BATSON v. KENTUCKY

Carr, a black man, was convicted of the capital murder of four white victims and sentenced by an all-white jury. Carr contends that the prosecution violated the principle set out in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by improperly using a peremptory challenge to excuse a potential juror, who was black. After excusals for cause, Ms. Wicks was the sole potential black juror. Carr objected during the jury selection process, and now contends that the peremptory challenge of the sole black juror violates Batson, which prohibits the exclusion of persons from a jury on the basis of race.
During voir dire, the trial court asked the venire panel if the fact that the jurors selected to hear this case would have to be sequestered for the course of the trial would present an undue hardship. Several of the venire responded affirmatively, including Ms. Wicks, who stated:
I also have two children to support and my husband works shift work, and I don't have any relatives here in Corinth.
THE COURT: Is there not anyone, Ms. Wicks, that could take care of your children this week?
MS. WICKS: Well, I could ÔÇö I don't know of anybody. My husband has a few relatives here, but I don't know if they will be willing to take care of them or not.
Those jurors who had responded affirmatively to the question of hardship were questioned individually in chambers. Ms. Wicks, questioned by the court and counsel, again indicated her concern regarding child care for her thirteen year old daughter and nine year old son. She indicated that she and her husband did not leave the children home alone at night and that she did not know what kind of arrangements could possibly be made in the event she was selected for this jury.
Defense counsel wanted Ms. Wicks to be allowed to call home to see if she could possibly make arrangements regarding child care. The trial judge denied this request, stating he did not want jurors calling and discussing the case.
When the prosecution peremptorily challenged Ms. Wicks, Carr objected, noting that Ms. Wicks was a black panel member. The prosecution stated that the race neutral reason for the peremptory challenge was based on the difficulty Ms. Wicks had indicated she would have finding suitable child care. The *844 trial court ruled that the prosecution's challenge was a neutral, nondiscriminatory reason for exercising a peremptory challenge.[3]
Batson set forth a three-part test for a defendant to establish a prima facie case of purposeful discrimination in jury selection:
[t]o establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87-88 (citations omitted).
The fact that Carr is a black man, and that the prosecution peremptorily challenged Ms. Wicks, a black woman, meets the first and second prongs of the Batson test. The third prong of the Batson test requires that Carr show that the prosecution used its peremptory challenges for the purpose of excluding minorities. See Lockett v. State, 517 So.2d 1346, 1349 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). The trial court found that the reason stated by the prosecution for the peremptory challenge of Ms. Wicks was racially neutral, especially given the fact that two white women had been excused earlier for cause due to hardship for factually similar reasons.
This Court gives "great deference" to the trial court's findings of fact on this issue. Willie v. State, 585 So.2d 660, 672 (Miss. 1991) (citing Bradley v. State, 562 So.2d 1276, 1283 (Miss. 1990)). "As long as the trial court was within its authority when it determined that the State articulated a `neutral, non-race based explanation,' we will not reverse." Willie, 585 So.2d at 672 (quoting Chisolm v. State, 529 So.2d 635, 639 (Miss. 1988)).
We find the trial court did not exceed its authority in finding the State's exercise of its peremptory challenge of Ms. Wicks race neutral. This assignment of error has no merit.

XIII.

THE PROSECUTION VIOLATED DEFENDANT'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS BY COMMENTING ON CARR'S RIGHT TO SILENCE.

A.

THE DOYLE VIOLATION
Carr argues that the prosecution improperly commented on his right to remain silent following arrest during closing argument of the guilt phase. The challenged statements are:
Although I'm taking a little more time than I should, I've got to tell you about Anthony Washington. When Anthony Washington talked to this defendant, this defendant was not talking to a law enforcement officer, they had been making phone calls, trying to call a girlfriend, and what's the first thing he told him? He said, "Man, we had a ball. We had a ball." That means that he enjoyed, he had a good time tying up people, shooting them in the back, sexually battering a nine-year-old child anally... . And then he told him, he said, `I want to talk to you brother to brother... .'
In Johnson v. State, 596 So.2d 865 (Miss. 1992), this Court held that the prosecutors's repeated comments on the defendant's post-arrest silence, after receiving Miranda warnings,[4] *845 violated the due process clause of the Fourteenth Amendment, as held in Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Johnson, 596 So.2d at 868-869.
In Dunaway v. State, 551 So.2d 162 (Miss. 1989), this Court announced the test to be used to determine if there was improper comment by the prosecutor:
the test to determine if an improper argument by a prosecutor requires reversal is whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice.
Id. at 163.
A defendant has the right to remain silent following arrest, and not have that silence used against him; however, this is not a case of the prosecutor improperly commenting on Carr's silence. In his closing argument, the prosecutor, relying on the evidence produced at trial, referred to the relationship between Carr and Washington, and described the circumstances under which Carr made some of the statements to which Washington testified. This was not an attempt by the prosecutor to comment on the fact that Carr was silent following his arrest. The prosecutor's statements were not improper. Furthermore, these statements were unlikely to create any unjust prejudicial effect against Carr. See Dunaway, 551 So.2d at 163. Compare Johnson, 596 So.2d at 865.
This issue is without merit.

B.

THE GRIFFIN VIOLATION
Carr also argues that the prosecutor improperly commented on his failure to testify at trial, thereby violating his Fifth Amendment right against self-incrimination. The challenged portion of the prosecutor's closing remarks follows:
It would be unfair to have the State to prove the impossible, we don't have a video tape of this. And the defendant and his accomplice saw that there are no eyewitnesses in this case, there are none left. And this is capital murder, and of course it is important, and in a capital murder case, these people who kill their victims and kill their eyewitnesses cannot be set free. The proof is overwhelming. Don't let him get by with this. Don't let him get by with this. There are no eyewitnesses because of him, because of his accomplice.
Carr claims this statement by the prosecution highlighted the fact that the only persons alive who could have testified as to what really happened were Carr and his accomplice.
"A defendant has a constitutional right not to take the witness stand. This right becomes meaningless if comment or insinuation can be made reflecting upon his failure to testify." Livingston v. State, 525 So.2d 1300, 1306 (Miss. 1988) (citations omitted). A prosecutor is prohibited, either by direct comment, insinuation or innuendo, from commenting on the defendant's failure to testify. However, what constitutes such prosecutorial wrongdoing is to be determined from the facts and circumstances of each case. Peterson v. State, 357 So.2d 113, 117 (Miss. 1978).
Carr cites many of this Court's opinions that condemn prosecutorial comment on the defendant's failure to testify. However, the language this Court condemned in those cases was much more direct than in the case sub judice. See, e.g., Brown v. State, 340 So.2d 718, 721 (Miss. 1976) ("It's undisputed. Nobody disputed his testimony."); Martin v. State, 200 Miss. 142, 26 So.2d 169, 171 (1946) ("undisputed by any testimony"); Lambert v. State, 199 Miss. 790, 25 So.2d 477 (1946) ("Where is the testimony that he did not do it?).
In the context of the facts and circumstances of the case sub judice, the prosecutor's closing argument did not comment on the failure of Carr to testify, nor did it include any such insinuation.
Neither of the challenged portions of the prosecutor's closing argument violates Carr's constitutional rights. This assignment is without merit.

*846 XIV.

THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF DR. MONA CARLYLE.
Carr called Dr. William Kallman, a licensed clinical psychologist, as an expert witness. Dr. Kallman performed various standardized tests on Carr and spent approximately ten hours with him. It was Dr. Kallman's opinion that it would be unlikely that Carr would reveal information about his personal sexual behavior to a stranger.
During an earlier hearing in chambers, the State had objected to Dr. Kallman's proposed testimony. The trial court ruled Dr. Kallman's testimony admissible and also held that the State would be permitted to cross-examine him on the particular character trait and offer anything in rebuttal.
The State called Dr. Mona Carlyle, a clinical psychologist, in rebuttal. Carr objected to her being allowed to render an opinion because she had never personally interviewed Carr. The court overruled the objection. Based on a review of Dr. Kallman's file and facts related to the witness in the form of a hypothetical, Dr. Carlyle rendered her opinion that Carr would be highly likely to reveal information about his personal sexual behavior to a stranger. Carr argues that it was improper to allow Dr. Carlyle to give an expert opinion based solely on the opinions and testimony of other expert witnesses.
Carr cites Harvey v. State, 207 So.2d 108, 118 (Miss. 1968), for the proposition that an expert witness cannot express his or her opinion based upon the opinion and testimony of other experts. Carr also relies on Butler v. State, 245 So.2d 605 (Miss. 1971), where this court found reversible error when a doctor testified to the mental condition of the appellant based upon the examination of other doctors who were not called to testify. This Court reversed on "the basic and fundamental right to be confronted by the witness as well as the right of cross examination." Id. at 607.
There are two distinguishing characteristics between the case sub judice and the holdings in Harvey and Butler. First, Dr. Carlyle based her opinion on the entire file of Dr. Kallman, not only his opinion and testimony. The file contained the results of the battery of tests Carr was given. Second, Dr. Kallman had been called as a defense witness in this case, thereby making him available for confrontational and cross-examination purposes.
We have recognized that professionals in the field of psychology regularly form opinions from observation, test data, and opinions of other doctors. See Turner v. State, 573 So.2d 657, 673 (Miss. 1990), cert. denied, 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991).
It is within the discretion of the trial court to determine if an expert is qualified to testify. Goodson v. State, 566 So.2d 1142, 1145 (Miss. 1990) (quoting May v. State, 524 So.2d 957, 963 (Miss. 1988)). We find no abuse of discretion by the trial court in allowing the rebuttal testimony of Dr. Carlyle. See Turner, 573 So.2d at 673. Accordingly, this assignment of error is meritless.

XV.

THE TRIAL COURT ERRED IN LIMITING CROSS-EXAMINATION OF DR. CARLYLE.
Carr claims that his cross-examination of Dr. Carlyle was improperly restricted. Defense counsel asked Dr. Carlyle whether she took into account Carr's mental functioning level in her assessment. Dr. Carlyle responded that she did. Defense counsel then attempted to get that mental functioning level admitted. The State's objection was sustained. The restriction on that line of questioning had been established earlier in chambers. Defense counsel sought to limit the State's cross-examination of Dr. Kallman in order to prevent the use of information in Dr. Kallman's report from being used as a springboard into other matters relating to the mental condition of Carr. The trial court allowed Dr. Kallman to testify solely as to the personality trait in question, and to explain the basis of his evaluation; however, the court limited it to the tests administered, not the specific results of those tests. Dr. Kallman was not asked about Carr's mental functioning level.
*847 With regard to the scope of cross-examination, we have stated:
[t]hough the scope of cross-examination is ordinarily broad, it is within the sound discretion of the trial judge, who possesses the inherent power to limit cross-examination to relevant matters.
However, the discretion of the trial court is not without limits; this Court has reversed where the trial court exceeded the limits in an area proper for cross-examination.
Hewlett v. State, 607 So.2d 1097, 1100 (Miss. 1992) (citations omitted). "[C]ross-examination on an irrelevant point is not permitted." Sayles v. State, 552 So.2d 1383, 1386 (Miss. 1989).
Although the scope of cross-examination is broad, the trial court properly restricted its use in this case. The trial court determined before Dr. Kallman testified that discussion of Carr's specific mental functioning level would not be permitted. Both defense counsel and the State were aware of this ruling. Dr. Kallman, who administered the tests, was not asked to testify as to the mental functioning level of Carr. The trial court did not abuse its discretion in limiting the cross-examination of Dr. Carlyle on this subject. There is no merit to this assignment of error.

XVI.

THE COURT ERRED IN INSTRUCTING THE JURY THAT "DELIBERATE DESIGN" COULD "EXIST IN THE MIND OF THE DEFENDANT BUT FOR AN INSTANT."
In each of the four counts of capital murder, the jury was instructed they could find Carr guilty of capital murder if they found beyond a reasonable doubt that "Carr, by his own act, or while acting in concert with another, did wilfully, feloniously, without authority of law and of his own deliberate design kill and murder [Carl, Bobbie Jo, Charlotte or Gregory]." The jury was also instructed on the element of "deliberate design" by guilt/innocence instruction D-16:
The Court further instructs the jury that deliberate design as used elsewhere in these instructions, means intent to kill, without authority of law and not being legally justifiable or legally excusable.
A deliberate design cannot be formed at the very moment of the fatal act, however, the deliberate design need not exist in the mind of the defendant for any definite time, not for hours, days, or even minutes, but if there is deliberate design, and it exists in the mind of the defendant but for an instant before the fatal act, this is sufficient deliberate design to constitute the offense of capital murder or murder.
Relying on Windham v. State, 520 So.2d 123 (Miss. 1987), Carr asserts the trial court erred in granting this instruction. In Windham, the trial court erroneously instructed the jury that deliberate design could be formed at the very moment of the fatal act. This Court stated that although it is possible that deliberate design can be formed very quickly, it was "a contradiction in terms to state that a `deliberate design' can be formed at the very moment of the fatal act. Moreover, it is possible for a deliberate design to exist and the slaying nevertheless be no greater than manslaughter." Id. at 126.
Carr's argument is disingenuous for two reasons. First, this is Carr's proffered instruction, not the State's; and there was no specific objection to it at the time of trial. This Court has previously held that it will not reverse for an error created by the defendant's own instruction. Young v. State, 420 So.2d 1055, 1057-1058 (Miss. 1982) (citing Reed v. State, 237 Miss. 23, 30, 112 So.2d 533, 535 (1959)). Second, there is no flaw in the instruction given as it specifically states that deliberate design cannot be formed at the very moment of the fatal act, thereby avoiding the pitfall of Windham. Furthermore, unlike Windham, manslaughter was not a theory of culpability for Carr.
There is no merit to this assignment of error.

XVII.

THE TRIAL COURT'S INSTRUCTION TO THE JURY ON THE MANNER OF ITS DELIBERATIONS WAS UNDULY COERCIVE, IN THAT IT FORBADE ANY CONSIDERATION OF THE *848 LESSER INCLUDED OFFENSES UNTIL AND UNLESS THE JURY HAD UNANIMOUSLY AGREED TO ACQUIT THE DEFENDANT OF THE GREATER CHARGE. THIS COERCIVE INSTRUCTION IS NOT REQUIRED BY MISSISSIPPI STATUTORY LAW, AND IN FACT VIOLATES THE DUE PROCESS CLAUSES OF THE STATE AND FEDERAL CONSTITUTIONS.
Carr contends that the trial court's instructions to the jury explicitly forbade any consideration of lesser included offenses until the jury agreed unanimously to acquit him, violating the due process clause of the state and federal constitutions. The challenged portions of S-1, S-2, S-3, and S-4 follow:
If the states fails to prove beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence any one or more of these elements, then you shall find the defendant not guilty of capital murder under [Count I, Count II, Count III, and Count IV], and you shall then proceed to consider the lesser included offense of murder of [Charlotte, Gregory, Carl and Bobbie Jo] Parker.
The State submits that the issue is procedurally barred for Carr's failure to contemporaneously object. The State further maintains that not only did Carr not object, he affirmatively accepted each of the proffered instructions. This assignment of error is procedurally barred.
Carr offers a number of cases from other jurisdictions that have found this "acquit first" type instruction fundamentally flawed. These other jurisdictions substitute an instruction permitting consideration of the lesser included offenses if the juror cannot agree on a verdict of the greater charge after a reasonable amount of time. However, none of the cited authority is binding on this Court.
Carr asserts that nothing in Mississippi law requires the "acquit first" instruction. The corollary to his argument is that nothing in Mississippi jurisprudence forbids it either.
Instructions S-1 through S-4 are not to be read unto themselves, but with the jury charge as a whole. See Jenkins, 607 So.2d at 1182 (citing Anderson v. State, 381 So.2d 1019, 1024 (Miss. 1980)). The trial court also gave instruction S-6, regarding the jury's consideration of the lesser included offense of murder:
The Court instructs the jury that if warranted by the evidence you may find the defendant guilty of a crime lesser than capital murder in any one or more of the four counts. However, not withstanding this right it is your duty to accept the law as given to you by the Court, and if the facts and law warrant a conviction of the crime of capital murder, then it is your duty to make such a finding uninfluenced by your power to find a lesser offense. This provision ... is included to prevent a failure of justice if the evidence fails to prove the original charge of capital murder ..., but does justify a verdict for the lesser crime of murder ...
In addition, instructions S-8, S-9, S-10, and S-11 placed the burden on the State for proving the lesser included offense of murder. Taking the jury charge as a whole, we find the jury was properly instructed.
This assignment of error is procedurally barred and without merit.

XVIII.

THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT THE CRIME OF KIDNAPPING REQUIRES THE ELEMENT OF ASPORTATION
Count III of the indictment against Carr charged him with the murder of Gregory Parker while "... engaged in the crime of kidnapping, by secretly confining and/or imprisoning against his will the said Gregory Parker, ..." in violation of Miss. Code Ann.  97-3-53 and  97-3-19(2)(e) (1972, as amended). Miss. Code Ann.  97-3-53 (Supp. 1993) defines the offense of kidnapping as follows:
Any person who shall without lawful authority forcibly seize and confine any other person, or shall inveigle or kidnap any other person with the intent to cause such person to be secretly confined or imprisoned against his or her will, ...
*849 During the guilt phase, the court instructed the jury on the underlying felony of kidnapping as it applied to the murder of Gregory Parker in the following manner:
Instruction No. S-3-A
The Court instructs the jury that one of the elements of the capital murder of Gregory Parker is kidnapping. Therefore, the State must prove the crime of kidnapping.
If you find from the evidence in this case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that:
(1) on or about February 2, 1990, the defendant, ANTHONY CARR, by his own act, or while acting in concert with another, did forcibly seize and confine Gregory Parker,
(2) without lawfully [sic] authority, and
(3) with the intent to cause Gregory Parker to be secretly confined against his will; that is, deprived of his liberty, by physically restraining him against his will and without his consent,
then ANTHONY CARR was engaged in the crime of kidnapping and it is your sworn duty to so find.
If the evidence fails to convince you beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence as to any of the above elements, then the defendant was not engaged in the crime of kidnapping.
Carr objected at trial to this instruction on the grounds that it failed to include "asportation" as an element of kidnapping. Carr's proffered instruction on kidnapping, which included "asportation" as an element of the crime, was refused by the court.
Carr argues that Aikerson v. State, 274 So.2d 124 (Miss. 1973), compels the inclusion of asportation in the instructions to the jury.
On several occasions since Aikerson, this Court has clarified the meaning of Miss. Code Ann.  97-3-53. In Hughes v. State, 401 So.2d 1100 (Miss. 1981), we restated the statute to clearly set forth the different elements which may constitute kidnapping:
Every person who shall, without lawful authority
(1) forcibly seize and confine any other,
(2) or shall inveigle or kidnap any other
(3) with intent
(a) to cause such person to be secretly confined or imprisoned in the state against his will,
(b) or to cause such other person to be sent out of this state against his will,
(c) or to cause such other person
(1) to be deprived of his liberty,
(2) or in any way held to service against his will...
Under the statute the state must prove that a person, without lawful authority, either (1) forcibly seized and confined another person, or (2) inveigled or kidnapped another person, intending to subject such person to either (a), (b), or (c) above.
Hughes, 401 So.2d at 1105; See also Williams v. State, 544 So.2d 782, 789 (Miss. 1987); Brewer v. State, 459 So.2d 293, 296 (Miss. 1984).
Thus,  97-3-53 does not require any allegation of transportation of the victim in the indictment. In fact, this Court plainly stated "that asportation was not a necessary ingredient of the indictment, so long as the indictment charges the victim was imprisoned against his will." Brewer v. State, 459 So.2d 293, 296 (Miss. 1984) (citing Cuevas v. State, 338 So.2d 1236 (Miss. 1976)).
The language in the indictment satisfied the statutory requirement, as well as this Court's. The jury was properly instructed as to the underlying felony of kidnapping. We find no merit to this assignment of error.

XIX.

THE TRIAL COURT ERRED IN REFUSING CARR'S JURY INSTRUCTION D-8, A MERCY INSTRUCTION.
Carr contends that the trial court erred in failing to grant jury instruction D-8, a mercy instruction. The disputed instruction reads:
Even if you find one, or more aggravating circumstances, and you find that the *850 aggravating circumstance, or circumstances, outweigh the mitigating circumstances, you may still conclude that the circumstances are insufficient to warrant the death penalty, and you may recommend mercy and sentence the defendant to life imprisonment.
You are not required to find any mitigating circumstances to make a recommendation of mercy that is binding on the trial court.
The State points out that a mercy instruction, D-6, was in fact given. Defense instruction D-6 stated:
The prosecution carries the burden of showing not only that aggravating circumstances exist, but also that they are sufficient to warrant the death penalty. If the prosecution merely proves the existence of an aggravating circumstance, you are free to find it insufficient to warrant death, and you are not required automatically to impose death.
This Court has held that a so-called mercy instruction is not required at trial. Jenkins v. State, 607 So.2d 1171, 1181 (Miss. 1992); Ladner v. State, 584 So.2d 743, 761 (Miss. 1991); See also Hansen v. State, 592 So.2d 114, 150 (Miss. 1991) ("our cases have consistently refused to hold that the Court is required to grant a mercy instruction." (citations omitted)).
The jury was adequately instructed that before it could sentence Carr to death, it had to weigh mitigating circumstances against aggravating circumstances, and, only if the latter outweighed the former, could it return a sentence of death. See Lockett v. State, 517 So.2d 1317, 1338 (Miss. 1987).
There is no merit to this assignment of error.

XX.

THE TRIAL COURT ERRED IN PERMITTING PORTIONS OF THE TRIAL TO TAKE PLACE OUTSIDE THE PRESENCE OF CARR.
Carr alleges that portions of the trial, namely bench conferences and jury instruction conferences, were conducted outside his presence, thereby violating both the United States and Mississippi Constitutions.
Carr points to four specific instances where he was not present. Three of those instances were off-the-record bench conferences during the trial,[5] and the fourth instance was a jury instruction conference. The jury instruction conference in question was merely a review of rulings on requested instructions the trial court had made the day before.[6] At no point in the proceedings did the defense attorneys object to Carr's absence, thereby barring such a claim at this stage in the proceedings. See Willie, 585 So.2d at 680.
In regard to matters presented outside the defendant's presence, this Court has held:
No important proceeding regarding a criminal trial may be held without the presence of the defendant or his counsel. Strickland v. State, 477 So.2d 1347 (Miss. 1985); Allen v. State, 384 So.2d 605 (Miss. 1980). Both need not be present; where the defendant is represented by counsel, the attorney may represent the defendant at any critical stage in the proceedings, and the defendant's absence will not violate his constitutional rights. Ford v. State, 170 Miss. 459, 155 So. 220 (1934).
An exception to this general rule is where the presence of the defendant is necessary to prevent prejudice to him. Caldwell [v. State], 481 So.2d [850] at 852.
Samuels v. State, 567 So.2d 843, 845 (Miss. 1990).
*851 Carr was represented by counsel at every critical stage of the proceedings, and thus Carr's presence was not constitutionally required. Moreover, Carr's absences do not implicate the exception to the general rule excusing the defendant's absence, as his absences from the bench conferences and the jury instruction colloquy did not work any prejudice to him. Accordingly, we find no merit to this claim.

PENALTY PHASE

XXI.

THE COURT ERRED IN ITS LIMITING INSTRUCTION OF THE AGGRAVATING CIRCUMSTANCE "THE CAPITAL OFFENSE WAS ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL."
At the jury instruction colloquy for the sentencing phase, Carr objected to the granting of the "especially heinous, atrocious, or cruel" aggravating factor. The trial court overruled the objection. The definitional instruction for this aggravating factor was then discussed. The court granted Carr's proposed instruction D-4, with one amendment to which Carr agreed.
Carr argues on appeal that the "especially heinous" aggravating circumstance is constitutionally invalid, and he asks that the case be reversed and remanded for a new sentencing hearing. As the State maintains, this issue is procedurally barred, because not only did Carr fail to object contemporaneously, but the instruction challenged before this Court is his own. Willie, 585 So.2d 660, 680. The State did make an alteration to the instruction; however, acceptance without objection after amendment is tantamount to a waiver of objection. Bieller v. State, 275 So.2d 97, 99 (Miss. 1973).
Viewing this issue on the merits, we find the "especially heinous" aggravator was accompanied by a proper limiting instruction.
The challenged limiting instruction reads:
The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or enjoyment of the suffering of others.
In order for you to find in this case the aggravating circumstance that the crime was especially heinous, atrocious, or cruel, you must unanimously find beyond a reasonable doubt that the capital offense was accompanied by such additional acts as to set the crime apart from the norm of capital offenses ÔÇö that is, that the crime was conscienceless, pitiless, or unnecessarily torturous to the victim.
Mississippi jurisprudence has been inundated with case law regarding the "especially heinous" aggravator. In Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the United States Supreme Court held that the aggravating circumstance of "especially heinous, atrocious, or cruel" was unconstitutionally vague if given without a limiting instruction. Gilliard v. State, 614 So.2d 370, 374 (Miss. 1992); See also Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).
The proper instruction defining the especially heinous aggravating circumstance is found in Coleman v. State, 378 So.2d 640 (Miss. 1979):
What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies ÔÇö the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

Id. at 648 (quoting Spinkellink v. Wainwright, 578 F.2d 582, 611 (5th Cir.1978) (citation omitted).
Paragraph one of instruction D-4 above, was constitutionally insufficient as a limiting instruction to the especially heinous aggravating factor when given alone. Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990). See also Jenkins v. State, 607 So.2d 1171, 1181 (Miss. 1992). However, paragraph two of sentencing instruction D-4 tracks the language approved in Coleman, 378 So.2d at 648, which is set out above. This language was also approved by the United States Supreme Court in Clemons, *852 494 U.S. at 751, 110 S.Ct. at 1449, 108 L.Ed.2d at 740.
In Jenkins, the Court was faced with a similar situation. The especially heinous limiting instruction given at trial contained three different parts: the insufficient Shell instruction, the approved Coleman instruction, and a portion that had not yet passed the United States Supreme Court litmus test, although still viable in this Court. This Court held that when read as a whole, the additional Coleman instruction properly narrowed the especially heinous aggravating circumstance for the jury's consideration. Jenkins, 607 So.2d at 1181-1182. See also Hansen, 592 So.2d at 152.
Furthermore, there was sufficient evidence in the record to warrant the instruction. Namely, the bodies had contusions, Mr. Parker's finger had been cut off after he died, and the victims suffered painful deaths.
Viewed in its entirety, D-4 was a proper limiting instruction for the "especially heinous, atrocious or cruel" aggravating circumstance because it comports with the requisite narrowing language found in Coleman.
This issue is procedurally barred and, in the alternative, without merit.

XXII.

THE TRIAL COURT ERRED IN ALLOWING THE JURY TO CONSIDER THE AGGRAVATING CIRCUMSTANCE PECUNIARY GAIN IN EACH OF THE FOUR CAUSES.
In each of the cases, the jury was instructed that it could consider as an aggravating factor whether the murder was committed for "pecuniary gain." Carr contends that this aggravating circumstance is vague and overbroad, and that in the murder of Carl Parker, it is duplicative of the underlying felony charge of robbery.
Review of this claim is procedurally barred for Carr's failure to make a contemporaneous objection. Cole v. State, 525 So.2d 365, 369 (Miss. 1987), cert. denied, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988). Even if there was no procedural bar, this issue lacks merit.
Carr argues that because the "pecuniary gain" aggravating factor was presented to the jury without a limiting instruction, this case should be reversed and remanded for a new sentencing proceeding. The basis of Carr's argument is that without a limiting instruction, "pecuniary gain" could have unlimited applications.
This Court has recently taken steps to limit the use of the "pecuniary gain" as an aggravator when it is used in association with the underlying felony aggravator of robbery. In Willie v. State, 585 So.2d 660, 681 (Miss. 1991), this Court found that because the robbery and pecuniary gain aggravators were essentially the same, they could not be given together. The Court explained its reasoning as follows:
In Ladner, we observed that in a particular case the evidence may be such that the aggravating circumstances of robbery and pecuniary gain are both clearly supported by the evidence. In the absence of such a case, we held that the pecuniary gain aggravator should not be given. Ladner, 584 So.2d 743.
Today, we go one step further. Not only should the two aggravators not be given as separate and independent aggravators when they essentially comprise one, they may not be given. When life is at stake, a jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind the underlying felony as separate aggravators.
Willie, 585 So.2d at 680-681 (citations omitted). See also Jenkins v. State, 607 So.2d 1171, 1182 (Miss. 1992). However, Willie is prospective from the date of the decision, July 24, 1991. Id. at 681.
The underlying felonies in the murders of Gregory, Bobbie Jo and Charlotte Parker were, respectively, kidnapping, arson, and sexual battery. The use of the pecuniary gain aggravator in those cases was proper.
Both robbery and pecuniary gain were submitted to the jury as aggravating factors in the murder of Carl Parker. The evidence in this case clearly supported both aggravators. Evidence supporting a finding of robbery *853 included the fact that Carl Parker's ring finger on his left hand was amputated in addition to the fact that a man's wedding ring was found in Robert Simon's apartment along with the engagement and wedding rings positively identified as belonging to Bobbie Jo Parker. The pecuniary gain aggravator was supported by evidence that objects of value were taken from the Parker home and many of the Parker's belongings were found in Carl Parker's pick-up truck which was removed from his home.
This issue is procedurally barred; in the alternative, it is without merit.

XXIII.

THE PROSECUTION'S CLOSING ARGUMENT CONCERNING BIBLICAL LAW VIOLATED ANTHONY CARR'S RIGHT TO A FAIR TRIAL.
Carr contends that the prosecutor's Biblical references during the State's closing arguments at the sentencing phase deprived Carr of a fair trial. Defense counsel made use of Biblical references in his own closing arguments as well, which renders his position highly tenuous. As Carr failed to make a contemporaneous objection to the Biblical references, this issue is barred from review by this Court. Hansen v. State, 592 So.2d 114, 140 (Miss. 1991).
However, even if the issue were not procedurally barred, there is no merit to Carr's argument. This Court has continually held that counsel is afforded broad latitude in closing argument. This latitude, set out by the Court in Nelms & Blum Co. v. Fink, 159 Miss. 372, 382-383, 131 So. 817, 820 (1930), has been referred to in the context of capital cases. In Nelms, we stated that "[c]ounsel may draw upon literature, history, science, religion, and philosophy for material for his argument." Id. at 382-384. See Hansen v. State, 592 So.2d 114, 139-140 (Miss. 1991); Shell v. State, 554 So.2d 887, 899 (Miss. 1989), vacated on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); Johnson v. State, 416 So.2d 383, 391 (Miss. 1982).
This assignment of error is procedurally barred; alternatively, it has no merit.

XXIV.

THE TRIAL COURT ERRED IN ALLOWING THE JURY TO CONSIDER THE AGGRAVATING CIRCUMSTANCE OF "AVOIDING LAWFUL ARREST" IN EACH OF THE FOUR CASES.
Carr contends that it was improper for the trial court to instruct the jury to consider the aggravating circumstance of whether "the capital offense was committed for the purpose of avoiding or preventing a lawful arrest." Carr finds error in the fact that no limiting instruction defining "avoiding arrest" was given. Further, Carr alleges there was insufficient evidence presented at trial in support of the aggravating circumstance. The State again raises defense counsel's failure to object to the instruction at trial, and submits that the issue is procedurally barred. The State also contends that there was sufficient evidence to support the aggravating circumstance of "avoiding arrest."
This Court in Hansen v. State, 592 So.2d 114 (Miss. 1991), addressed this issue of avoiding arrest and the need for a limiting instruction to narrow this aggravator. We stated:
Hansen next takes issue with the aggravating circumstance found in Miss. Code Ann.  99-19-101(5)(e) (Supp. 1987), "The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." It is argued some sort of limiting instruction need be given to narrow this aggravator. In Leatherwood v. State, 435 So.2d 645, 651 (Miss. 1983), we rebuffed this contention, stating,
If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killings or to `cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.
Under this construction the Court properly submits this aggravator to the jury, if evidence existed from which the jury could *854 reasonably infer that concealing the killer's identity, or covering the killer's tracks to avoid apprehension and arrest, was a substantial reason for the killing.
Hansen, 592 So.2d at 152-153.
Thus, it is this Court's role to inquire into whether there is any credible evidence upon which the jury could find the aggravating circumstance in question. Lanier v. State, 533 So.2d 473, 490 (Miss. 1988).
The evidence showed that Charlotte, Gregory and Carl Parker had been bound. All four of the Parkers had been shot at least once. Charlotte died of smoke inhalation, while the rest of her family died of the gunshot wounds. Carl Parker's truck was found in Clarksdale loaded with the Parker's possessions, ranging from a ceiling fan pulled out of the ceiling to clothes. There was evidence presented that the Parker home was burned to the ground as a result of an incendiary device. In addition, the jury heard testimony from Anthony Washington that Carr said that his partner told him they had to burn the house down to destroy the evidence.
The jury could reasonably infer from the evidence presented that the killings were committed to avoid arrest. We find the trial court properly submitted the aggravating circumstance of "avoiding arrest" to the jury. See Hansen, 592 So.2d at 153.
This assignment of error is procedurally barred due to Carr's failure to object. Alternatively, on the merits, there is no basis for finding error on this issue.

XXV.

THE TRIAL COURT ERRED IN LIMITING CONSIDERATION OF EMOTIONAL DISTURBANCE MITIGATION TO "EXTREME EMOTIONAL DISTURBANCE."
Carr argues that because the "extreme mental or emotional disturbance" mitigating factor was submitted to the jury, the jury's consideration of the evidence was unconstitutionally limited since they were not permitted to consider any emotional disturbance.
The State contends that the list of mitigating factors given the jury was the defense's list, not the prosecution's. Therefore, the State concludes that Carr cannot at this stage complain of the mitigating circumstances submitted. Furthermore, the State argues that any deficiency inherent in the "extreme emotional disturbance" mitigator was cured with the jury's consideration of the "capacity of the defendant to appreciate the criminality of his conduct or to conform to the requirements of law" mitigator, as well as the catch-all mitigating factor of "[a]ny circumstances or combination of circumstances surrounding the defendant's life and character which reasonably mitigates against imposition of the death penalty."
Carr did in fact submit the list of mitigating factors to the court which were given to the jury for consideration. Furthermore, during closing argument in the sentencing phase, defense counsel referred specifically to that factor using the "extreme" language.
The United States Constitution requires that the jury not be precluded from considering any aspect of a defendant's character or record or any circumstances of the offense as mitigating factors. Ladner v. State, 584 So.2d 743, 762 (Miss. 1991) (citing Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973, 990 (1978)).
In Neal v. State, 451 So.2d 743 (Miss. 1984), this Court, faced with an impermissibly restrictive mitigating circumstance argument, stated that the jury should not be precluded from considering mitigating circumstances; however, the Court stated that there must be an evidentiary basis for a mitigating circumstance instruction. Id. at 760-761. Furthermore, the Court stated that the catch-all mitigating factor should be granted to avoid this claim of error in the future. Id. at 761, n. 11.
The only evidence as to emotional disturbance presented at the sentencing hearing was the testimony of Dr. Kallman. He testified that it was his opinion that Carr had a serious underlying psychotic condition.
Carr cites no binding authority for his position; however, he does quote from a Florida Supreme Court case considering the *855 same mitigating factor. In Cheshire v. State, 568 So.2d 908 (Fla. 1990), the trial court overrode the jury's recommendation of life imprisonment, and sentenced the defendant to death. The trial court found no mitigating factors, and three aggravating factors. The trial court concluded that emotional disturbance was not a mitigating factor because it failed to meet the statutory criterion of "extreme." Id. at 910. The Florida Supreme Court stated that it would be clearly unconstitutional for the state to restrict consideration to only extreme emotional disturbances; any emotional disturbance relevant to the crime must be considered. Id. at 912.
The case sub judice is distinguishable from Cheshire. First, this is not a case of the trial court's overriding a jury verdict to give a harsher sentence. Second, the jury instructions on mitigating factors, when read as a whole, provide ample opportunity for a jury to give consideration to any emotional disturbance Carr may have suffered.
There was evidence that Carr was entitled to an emotional disturbance instruction. However, the "catch-all" mitigating factor, along with the "extreme emotional disturbance," and "capacity to appreciate criminality" mitigating factors allowed the jury to consider any mitigating evidence. We find no error in this assignment.

XXVI.

THE TRIAL COURT ERRED IN REFUSING TO GIVE PEREMPTORY INSTRUCTIONS ON THE UNDISPUTED MITIGATING CIRCUMSTANCES.
During the sentencing phase, Carr presented the trial court with five instructions to the jury that they must find as mitigating factors: that Carr had no significant history of criminal activity; that the capital offense was committed while Carr was under extreme mental or emotional disturbance; that Carr's capacity to appreciate the criminality of his conduct was substantially impaired; that Carr was an accomplice in the capital offense committed by another person and that his participation was relatively minor; and that Carr acted under extreme duress or under the substantial domination of another person. The trial court refused to give these instructions, finding them peremptory in nature.
Carr alleges that because the Mississippi legislature has deemed these factors mitigating,[7] and because there was no evidence presented to rebut these factors, he was entitled to have the jury so instructed. The State denies that these factors were uncontested.
The jurors were instructed on the mitigating circumstances, pursuant to the defense's submitted instructions. Moreover, the jury was further instructed:
you, as individual jurors, must consider mitigating circumstances, if you find any to exist. Therefore, even if all other eleven jurors find that a certain mitigating circumstance does not exist, if you believe it does exist, you must find that mitigating circumstance, and weigh it in your further deliberations.
In Wiley v. State, 484 So.2d 339 (Miss. 1986), cert. denied, 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278 (1986), and overruled on other grounds by Willie v. State, 585 So.2d 660 (Miss. 1991), this Court reiterated the standard for considering peremptory instructions:
In determining whether a peremptory instruction should be granted and whether the verdict is contrary to the overwhelming weight of the evidence, the Court is required to accept as true all of the evidence favorable to the State, together with reasonable inferences arising therefrom, to disregard that evidence favorable to the defendant, and, if such evidence will support a verdict of guilty beyond a reasonable doubt, the peremptory instruction should be refused.
Id. at 349-350. (quoting Carroll v. State, 396 So.2d 1033, 1035 (Miss. 1981) (citations omitted)).
After examining the record, we find sufficient evidence that the mitigating factors should have been left for the jury's consideration. For example, Carr had been previously convicted of grand larceny; thus, the mitigating *856 factor of whether Carr had a significant history of criminal activity was contested. The factor regarding whether Carr was under extreme emotional disturbance was based solely on the testimony of Dr. Kallman. It was for the jury to decide if Dr. Kallman was a credible witness. The same is true of the other mitigating factors.
Moreover, this Court has held:
The Eighth and Fourteenth Amendments to the Constitution require that the jury not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973, 990 (1978). This requirement, however, does not prevent the prosecution from offering rebuttal evidence as to the existence of the mitigating circumstances. Faraga v. State, 514 So.2d 295, 304 (Miss. 1987), cert. denied, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 894 (1988).
Ladner, 584 So.2d at 762. We did not state that the jury must find these factors. That is left to the province of the jury. See also, Miss. Code Ann.  99-19-101(3) (Supp. 1993).
We find the evidence in the case sub judice supports the verdict beyond a reasonable doubt. The peremptory instruction was properly refused. See Wiley v. State, 484 So.2d 339 (Miss. 1986) overruled on other grounds. This assignment of error is without merit.

XXVII.

THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY IT MUST MAKE FINDINGS OF THE ACGRAVATING CIRCUMSTANCES.
Carr argues that the failure to instruct the jury that it must make written findings of aggravating circumstances, before using them in the weighing process, produced an ambiguous verdict in violation of the Sixth and Fourteenth Amendments to the United States Constitution, and Art. 3,  24 of the Mississippi Constitution. Carr accuses the jury of merely "parroting" the list of aggravating factors in the sentencing forms. The State maintains that there was nothing ambiguous about the four written jury verdicts.
Miss. Code Ann.  99-19-101, (Supp. 1993) is the applicable law to be followed in the sentencing of a capital murder defendant. Section 99-19-101(3) states that in order for a jury to impose a sentence of death, it must unanimously find in writing that the aggravating factors outweigh the mitigating ones. It further requires that the determination of the jury be supported by specific written findings of fact based upon the mitigating and aggravating circumstances.
The jury unanimously found in writing that the aggravating factors outweighed the mitigating ones. The fact that specific written findings supporting the jury's determination were "parroted" from the sentencing forms does not render the verdict ambiguous. In fact, it renders the jury's findings specific. This assignment of error lacks merit.

XXVIII.

THE TRIAL COURT ERRED IN INSTRUCTING THE JURY AT SENTENCING IT COULD CONSIDER THE "DETAILED CIRCUMSTANCES OF THE OFFENSE."
Carr assigns as error the trial court's instructions to the jury during the sentencing phase that they should consider the detailed circumstances of the offense when making their decision. Carr bases his position on the fact that at the sentencing phase, the jurors are restricted to hearing and considering evidence related only to aggravating and mitigating circumstances.
The State posits that this assignment of error is procedurally barred because of Carr's failure to object at trial. The State further contends that when the jury instructions are read in totality, there is no merit to this claim. We agree.
Carr did fail to object at trial to instructions S-1, S-2, S-3, and S-4. Therefore, Carr's objection has not been properly preserved for review by this Court, and is thereby *857 waived. Willie v. State, 585 So.2d 660, 680 (Miss. 1991) (citing Moawad v. State, 531 So.2d 632, 635 (Miss. 1988); Cole v. State, 525 So.2d 365, 369 (Miss. 1987)). However, even if there were no procedural bar, Carr's contentions are still without merit.
Each of the four sentencing instructions began with the trial court telling the jury that:
[i]n reaching your decision, you may objectively consider the detailed circumstances of the offense for which the defendant was convicted, and the character and record of the defendant himself. You should consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction, but you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.
The jury instructions are to be reviewed as a whole. Willie, 585 So.2d at 680 (citing Roundtree v. State, 568 So.2d 1173, 1177 (Miss. 1990); Shell v. State, 554 So.2d 887, 900 (Miss. 1989), rev'd on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990)). In considering the instructions in their entirety, it is apparent that the jury was properly instructed in the framework within which it was to consider mitigating and aggravating circumstances.
Moreover, in Ladner v. State, 584 So.2d 743, 760 (Miss. 1991), the jury was instructed using the same "detailed circumstance" language. It was upheld as a proper instruction. See also King v. State, 421 So.2d 1009, 1017 (Miss. 1982). This assignment of error is procedurally barred, and it lacks merit.

XXIX.

THE DEATH PENALTY IS DISPROPORTIONATE IN THIS CASE WHERE THE DEFENDANT HAS A LONG HISTORY OF MENTAL PROBLEMS AND RETARDATION, THE JURY DID NOT FIND THAT HE KILLED OR ATTEMPTED TO KILL, AND HIS INVOLVEMENT WAS MINOR COMPARED TO THE CODEFENDANT.
Carr argues that the death penalty is disproportionate for three reasons: 1) his mental retardation and organic brain damage; 2) the fact that the jury did not find that he killed or attempted to kill the victims; and 3) the fact that his participation, if any, was minor.
The State asserts that the four sentences of death are proper given the "abhorrent nature" of the murders and the fact that the four homicides were committed solely for pecuniary gain.
Miss. Code Ann.  99-19-105(3) (Supp. 1993) requires:
(3) With regard to the sentence, the court shall determine:
(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; and
(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
In accordance with this section, this Court must review the record in this case and compare it with other capital murder cases in which this Court has entered judgment since Jackson v. State, 337 So.2d 1242 (Miss. 1976). See Irving v. State, 361 So.2d 1360, 1370-1371 (Miss. 1978).
Carr first argues that evidence that he suffers from organic brain damage and mild mental retardation[8] requires reversal of the death sentence as disproportionate. For authority he cites Edwards v. State, 441 So.2d 84 (Miss. 1983). However, Edwards is inapplicable here. Conner v. State, 632 So.2d 1239, 1265 (Miss. 1993) (citing Churchill v. Pearl River Basin Development District, 619 So.2d 900 (Miss. 1993)). The facts in this case are distinguishable as Carr was not diagnosed *858 as a paranoid schizophrenic. See Conner, 632 So.2d at 1265-1266.
Carr's second contention is that because the jury did not find that he either killed or attempted to kill, the death penalty is disproportionate. He cites another non-binding plurality opinion, Bullock v. State, 525 So.2d 764 (Miss. 1987), where a death sentence was reversed on the basis that it was disproportionate to similar cases. However, Bullock is distinguishable in that the sole finding in that case to support a death sentence was that the defendant contemplated lethal force. Furthermore, Bullock's accomplice, the actual killer, received only a life sentence. Id. at 770. Here, the jury found Carr both contemplated the use of lethal force and intended that the killing take place. As discussed in Issue VIII, supra, both findings were supported by substantial evidence. It should also be noted that Carr's accomplice, Robert Simon, Jr., was convicted and sentenced to death.
Carr's last argument under this assignment is that the death sentence is disproportionate because his participation in the crime was minor. He cites Reddix v. State, 547 So.2d 792 (Miss. 1989), where this Court found a death sentence disproportionate. Reddix is distinguishable in that Reddix did nothing physically to assist in the assault and his accomplice, the actual killer, received only a life sentence. Id. at 794.
From a thorough review of the record, we find the jury did not appear to be under the influence of passion, prejudice or any other arbitrary factor in its imposition of the death penalty against Carr. See Hansen v. State, 592 So.2d 114, 154 (Miss. 1991). Furthermore, the evidence developed below clearly supports the jury's finding of aggravating circumstances pursuant to Miss. Code Ann.  99-19-101 (Supp. 1993). Finally, in considering the crimes and the manner in which they were committed, the imposition of the death penalty against Carr is consistent with sentences imposed in similar cases.
This assignment of error has no merit.

XXX.

THE CUMULATIVE ERROR IN THIS RECORD REQUIRES THAT THE CONVICTION AND SENTENCE BE REVERSED.
Carr alleges that the State was able to obtain four death sentences "despite a profound lack of evidence." Carr cites to Stringer v. State, 500 So.2d 928, 946 (Miss. 1986), for this Court's position that several near-errors can cumulatively render a trial unfair.
After a thorough review of the record and each assignment of error, we found no error warranting reversal, either at the guilt phase or the sentencing phase. The cumulative effect of any errors in this case was harmless beyond a reasonable doubt. See Hansen v. State, 592 So.2d 114, 153 (Miss. 1991). There is no merit to this assignment of error.

CONCLUSION
Following a thorough review of the record and analysis of each assignment of error, we find no basis for reversal. The conviction of capital murder and sentence of death imposed on Anthony Carr are supported by substantial evidence. We affirm the conviction and sentence of death on each of the four counts.
CONVICTION OF CAPITAL MURDER (FOUR COUNTS) AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED. WEDNESDAY, MARCH 8, 1995, SET FOR INFLICTION OF THE DEATH PENALTY AS PROVIDED BY LAW.
HAWKINS, C.J., PRATHER, P.J., and PITTMAN, McRAE and SMITH, JJ., concur.
DAN M. LEE, P.J., concurs except as to Issue I of Guilt Phase.
BANKS, J., dissents with separate written opinion joined by Sullivan, J.
DAN M. LEE, P.J., joins as to Part II only.

APPENDIX

DEATH CASES AFFIRMED BY THIS COURT
Chase v. State, 645 So.2d 829 (Miss. 1994).
*859 Conner v. State, 632 So.2d 1239 (Miss. 1993).
Hansen v. State, 592 So.2d 114 (Miss. 1991).
* Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State, 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.
Davis v. State, 551 So.2d 165 (Miss. 1989).
Minnick v. State, 551 So.2d 77 (Miss. 1989).
[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.
[*]Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.
Woodward v. State, 533 So.2d 418 (Miss. 1988).
Nixon v. State, 533 So.2d 1078 (Miss. 1987).
Cole v. State, 525 So.2d 365 (Miss. 1987).
Lockett v. State, 517 So.2d 1346 (Miss. 1987).
Lockett v. State, 517 So.2d 1317 (Miss. 1987).
Faraga v. State, 514 So.2d 295 (Miss. 1987).
[*]Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE
Duplantis v. State, 644 So.2d 1235 (Miss. 1994).
Harrison v. State, 635 So.2d 894 (Miss. 1994).
*860 Butler v. State, 608 So.2d 314 (Miss. 1992).
Jenkins v. State, 607 So.2d 1171 (Miss. 1992).
Abram v. State, 606 So.2d 1015 (Miss. 1992).
Balfour v. State, 598 So.2d 731 (Miss. 1992).
Griffin v. State, 557 So.2d 542 (Miss. 1990).
Bevill v. State, 556 So.2d 699 (Miss. 1990).
West v. State, 553 So.2d 8 (Miss. 1989).
Leatherwood v. State, 548 So.2d 389 (Miss. 1989).
Mease v. State, 539 So.2d 1324 (Miss. 1989).
Houston v. State, 531 So.2d 598 (Miss. 1988).
West v. State, 519 So.2d 418 (Miss. 1988).
Davis v. State, 512 So.2d 1291 (Miss. 1987).
Williamson v. State, 512 So.2d 868 (Miss. 1987).
Foster v. State, 508 So.2d 1111 (Miss. 1987).
Smith v. State, 499 So.2d 750 (Miss. 1986).
West v. State, 485 So.2d 681 (Miss. 1985).
Fisher v. State, 481 So.2d 203 (Miss. 1985).
Johnson v. State, 476 So.2d 1195 (Miss. 1985).
Fuselier v. State, 468 So.2d 45 (Miss. 1985).
West v. State, 463 So.2d 1048 (Miss. 1985).
Jones v. State, 461 So.2d 686 (Miss. 1984).
Moffett v. State, 456 So.2d 714 (Miss. 1984).
Lanier v. State, 450 So.2d 69 (Miss. 1984).
Laney v. State, 421 So.2d 1216 (Miss. 1982).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT
Reddix v. State, 547 So.2d 792 (Miss. 1989).
Wheeler v. State, 536 So.2d 1341 (Miss. 1988).
White v. State, 532 So.2d 1207 (Miss. 1988).
Bullock v. State, 525 So.2d 764 (Miss. 1987).
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY

[*]Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.

[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.
[*]Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.
[*]Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.
Russell v. State, 607 So.2d 1107 (Miss. 1992).
Holland v. State, 587 So.2d 848 (Miss. 1991).
Willie v. State, 585 So.2d 660 (Miss. 1991).
Ladner v. State, 584 So.2d 743 (Miss. 1991).
Mackbee v. State, 575 So.2d 16 (Miss. 1990).
Berry v. State, 575 So.2d 1 (Miss. 1990).
Turner v. State, 573 So.2d 657 (Miss. 1990).
State v. Tokman, 564 So.2d 1339 (Miss. 1990).
Johnson v. State, 547 So.2d 59 (Miss. 1989).
Williams v. State, 544 So.2d 782 (Miss. 1989).
Lanier v. State, 533 So.2d 473 (Miss. 1988).
Stringer v. State, 500 So.2d 928 (Miss. 1986).
Pinkton v. State, 481 So.2d 306 (Miss. 1985).
Mhoon v. State, 464 So.2d 77 (Miss. 1985).
*861 Cannaday v. State, 455 So.2d 713 (Miss. 1984).
Wiley v. State, 449 So.2d 756 (Miss. 1984).
Williams v. State, 445 So.2d 798 (Miss. 1984).
BANKS, Justice, dissenting:
Carr was entitled to a trial in the county where the crime was committed. He was deprived of that right in part because of the wrongful acts of the state. In these circumstances, at least, Carr was entitled to be tried in a county with a racial makeup similar to that in Quitman county so as to insure his constitutional right to a fair and impartial jury. Because he was deprived of that right, I dissent. I write also to note that I differ with the majority with regard to other issues which are not dispositive.

I.
The majority opinion details the actions of the prosecuting attorney which contributed to the publicity necessitating a change of venue in this case. It admonishes the district attorney but concludes that because, in its view, the trial was before a "fair and impartial jury" any error was cured. Majority opinion, ante at 841. I disagree.
A criminal defendant is entitled under our constitution to be tried in the county where the offense occurred. State v. Caldwell, 492 So.2d 575 (Miss. 1986). Here, due in part to the wrongful acts of the prosecuting attorney, Carr was compelled to relinquish that right. To compound the injury, the court transferred the case to a place demographically far removed from that of the area where the crime was committed. Put simply, because of the combination of state actions generating publicity and the choice of alternate venue, Carr was tried before a jury from which black citizens had been systematically removed.
In his motion for change of venue, Carr requested that venue be changed to a county of similar racial demographics as that of Quitman county. The 1980 census provided by Carr evinced that Quitman county was comprised of a 50% white voting population and a 50% non-white voting population. Instead of changing venue to a county demographically similar, venue was changed to Alcorn County where the population was 90.3% white and 9.7% non-white. The record reflects, and the State does not refute, that of the 159 veniremen called for jury duty, only six were black. Thus, blacks comprised only 4% of the venire. The State does not refute Carr's assertion that no blacks actually served on the jury panel. Because there was a significant disparity between the racial composition of the counties, Carr's right to be tried by a jury representing a fair-cross section of the community and to be free from systematic exclusion of jurors because of race were impermissibly violated.
Although the majority holding on this issue rests on the proposition that there was no evidence presented that Carr did not receive a trial by an impartial jury, the majority fails to recognize the foundation upon which a fair and impartial jury is derived, and has thus failed to consider the factors which impact upon a trial by a fair and impartial jury. Simply put, that a trial appears otherwise fair has never been a sufficient answer to systematic exclusion and fair cross-section concerns. See Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1988).
This Court recently considered the issue of whether a defendant who successfully moves for a change of venue is entitled to a jury of similar racial composition as the original county in Simon v. State, 633 So.2d 407 (Miss. 1993). There, venue was originally established in Quitman County where a 1980 census evinced that 55.98% (7,074 out of 12,636 total citizens) of the county was composed of black residents, however, upon a successful motion for change of venue due to extensive pretrial publicity, the trial was moved to Jones County wherein blacks comprised only 23.13% (14,318 out of 61,912 total citizens) of the population. The majority, over the dissent of this writer, held that the defendant was not entitled to a second change of venue for the purpose of obtaining a jury of similar racial composition as Quitman County on the basis that there was no evidence presented establishing a prima facie case that the defendant was denied a trial by an impartial jury representing a fair *862 cross-section of the community. Id. at 412. Here the demographic disparity is even greater than that in Simon. Moreover, the state involvement in the publicity forcing the change of venue is raised, presenting an additional factor to be considered. This case is even more compelling than Simon for reversal on this issue.
Because the issues are practically identical except that the facts here are more compelling, I quote extensively from my dissent in Simon.
The right to a trial by jury is perhaps the most valued attribute of our judicial system. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1970). It embodies our commitment to democracy and individual rights. Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). The jury is intended to insure the participation of the governed and the protection of the individual from the state, Mississippi Publishers Corp. v. Coleman, 515 So.2d 1163, 1165 (Miss. 1987). In order to perform these duties, it is essential that the jury reflect the governed. Powers v. Ohio, 499 U.S. 400, 402, 111 S.Ct. 1364, 1366, 113 L.Ed.2d 411, 419 (1991) ("Jury service is an exercise of responsible citizenship by all members of the community, including those who otherwise might not have the opportunity to contribute to our civic life.") While we recognize that it is not practical, or even possible, to assure that each jury precisely reflect the physical, emotional, cultural and intellectual characteristics of the community as a whole, we have historically aspired to eliminate impediments to such a result. Cf. Hernandez v. New York, 500 U.S. 352, 369-71, 111 S.Ct. 1859, 1872, 114 L.Ed.2d 395, 413 (1991); Batson, 476 U.S. at 86-88, 106 S.Ct. at 1717, 1718.
In former times, geographic insularity played an important, perhaps dominant, role in shaping the culture and mores of particular communities. A defendant's right to be tried in the geographic area where the crime was committed is based in part on a right to be tried by people with the characteristics of those in the community where the action took place. U.S. v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236 (1944). In modern society, with instant world-wide communications and pervasive electronic media, the diversity of community characteristics is marked by factors of race, ethnicity, religion, gender and national origin to a much greater extent than by geography.
633 So.2d at 417. Thus, while historically, the law's concern with appropriate vicinage has been expressed solely in terms of geographical proximity, (see, for example, the statutes of other states requiring venue changes to be assigned to an adjoining county or nearest county cited in Simon, 633 So.2d at 417), it is appropriate that other factors be considered where modern communications have the dual effects of poisoning a broader geographic pool of jurors and of binding communities together on factors other than proximity.
It is also appropriate to reiterate a point in the Simon dissent, that the composition of a jury may have some affect on the outcome of a case, thus it is necessary to maintain a jury of similar characteristics to one which could have been drawn where the crime was committed. As I noted in Simon,
[p]erhaps the demographic characteristic of the most concern is that of race. In the words of Justice Sandra Day O'Connor, "[i]t is by now clear that conscious and unconscious racism can affect the way white jurors perceive minority defendants and the facts presented at their trials, perhaps determining the verdict of guilt or innocence. See Developments in the Law ÔÇö Race and the Criminal Process, 101 Harv.L.Rev. 1472, 1559-1560 (1988); Colbert, Challenging the Challenge: Thirteenth Amendment as a Prohibition Against the Racial Use of Peremptory Challenges, 76 Cornell L.Rev. 1, 110-112 (1990). Georgia v. McCollum, 505 U.S. 42, ___-___, 112 S.Ct. 2348, 2363-64, 120 L.Ed.2d 33, 57-58 (O'Connor, J., dissenting) (1992). [See also Nancy J. King, Postconviction Review of Jury Discrimination: Measuring the Effects of Juror Race on Jury Decisions, 92 Mich.L.Rev. 63, 81 (1993).] The articles cited relate studies which demonstrated the correlation *863 between single race and multi-race juries and outcome. Id. Without belaboring the point, it should be obvious to all that a drastic change in the racial make-up of a jury may affect outcome, and certainly affects the perception and acceptance of outcome, in high profile cases. For, "to perform its high function in the best way, `justice must satisfy the appearance of justice'." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (quoting Offutt v. U.S., 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954).
Id. at 418.
The degree of change in the racial composition of the community from which venire is to be selected is an essential factor which impacts upon the prospect of a trial by a fair and impartial jury. No person should be tried unless that factor, along with other factors such as relative freedom from prejudicial pretrial publicity, distance, and the capability of the prospective local to accommodate the proceeding, is carefully considered. Furthermore, there must be a race neutral reason given for the preference of the transferee county over other sites which are demographically more analogous. Simon, supra at 420.
Carr, absent compelling race-neutral reasons, is entitled to a new trial with venue appropriate in a county with a similar racial composition as that of Quitman County. Because he was deprived of that right, his conviction and sentence should be reversed and this matter remanded for a new trial before a jury selected from an appropriate venue.

II.
Carr has also taken issue with jury Instruction S-5, asserting that it is an erroneous instruction. The majority correctly notes that Carr failed to object to this instruction at trial but goes on to address it, nevertheless. I disagree with the majority conclusion that the instruction is proper.
The problem that I see is that the second part of the instruction, which attempts to apply the principle of law stated in the first clause to factual findings by the jury, leaves out a finding essential to the application of the principle enunciated. The principle of law is that "each person present at the time, and consenting to and encouraging the commission of crime" who "knowingly, wilfully, and feloniously" does an act which is an element of or connected with the crime or leads to its commission is guilty as a principle actor. In the second part of the instruction here in question, applying the principle of law to facts to be found, left out are the requirements that Carr be "present" and "consenting to" and "encouraging" the crime. It even leaves out the requirement that he "knowingly" perform an act. Because of these omissions I find the instruction fatally flawed.
The majority correctly notes that we approved this instruction in Simmons v. State, 568 So.2d 1192 (Miss. 1990). It was also given in Kelly v. State, 493 So.2d 356 (Miss. 1986), and Davis v. State, 586 So.2d 817 (Miss. 1991). The instruction is in my view, however, as shown by the analysis above, clearly flawed and its use should be discontinued. I have little quarrel with the majority conclusion that any error here has been waived by the failure to object to the instruction. Even so, it is essential that juries be accurately instructed as to the elements of crimes charged and as to the facts that it must find to find one guilty as a participant in a crime committed jointly. The instruction in question misleads. It should not enjoy the continued sanction of this court, even in dicta, and the prior cases approving the use of this form of instruction should be overruled.
SULLIVAN, J., joins this opinion.
DAN M. LEE, P.J., joins as to Part II only.
NOTES
[1] The trial judge found the statements not to be exculpatory in nature to Carr because Simon first said that Carr and another person killed the Parker's and later said that he killed the Parkers.
[2] Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Miss. Code Ann.  99-19-101(7) is a codification of Enmund. See White, 532 So.2d at 1219.
[3] The trial court had earlier excused for cause due to hardship two white women in similar circumstances. Juror number twelve told the court she was a single parent with an eight year old daughter. Juror number forty-one told the court that her husband did shift work and that they had five children at home. Both were excused for cause.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] The importance of preserving a record of all proceedings at trial should not be overlooked. It is the court reporter's obligation to record all proceedings and to have a transcript available in the event of an appeal. At the same time, the appellant is under the duty to ensure the record of the trial is sufficient to show any error of which he complains and that it was timely and properly preserved. Doby v. State, 557 So.2d 533, 537 n. 2 (Miss. 1990); Hansen v. State, 592 So.2d 114, 127 (Miss. 1991).
[6] At the earlier jury instruction conference, Carr was not present, his presence having been waived by defense counsel.
[7] See Miss. Code Ann.  99-19-101(6) (Supp. 1993).
[8] Dr. Kallman testified that Carr had a verbal IQ of 72 and a performance IQ of 63, giving him an overall IQ of 67. This score placed Carr in the mild range of mental retardation. Of the many test administered by Dr. Kallman, one showed possible brain damage. Dr. Kallman stated that it was his opinion that Carr had a serious underlying psychotic condition.
[*] Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.